# PIEDMONT AND GEORGE'S CREEK COAL COMPANY *vs.* CHARLES D. KEARNEY.

*Right of Owner of Surface Land to Subjacent Support from Owner of Minerals Under Land—Removal of Coal Causing Cracks in Surface of Land, Reducing Moisture, and Causing Permanent Injury to Buildings— Evidence—Measure of Damages.*

When one person owns the coal or other minerals in their natural bed under land, and another person owns the surface of the land, the latter has a right of subjacent support of the surface, and the owner of the minerals in removing them is bound to do so without injury to the surface or to the buildings on it.

The right of the owner of the surface to support as against the owner of minerals may be modified by the expressed terms of the grant of the land to him.

When a grant of land reserves to the grantor all coal and other minerals in the land, together with the right to mine and remove the same, the right of the grantee to subjacent support is not released or extinguished, either in express terms or by necessary implication.

The owner of the coal is not liable to the owner of the surface for injuries resulting from the diversion of hidden or percolating streams caused merely by the removal of the coal.

But if in removing the coal the surface of the land is made to crack in different places so that the rain runs into the crevices and the soil ceases to retain moisture, this loss of moisture diminishes the value of the land for agricultural purposes, and is an element of the damages which the owner of the surface is entitled to recover.

When the evidence does not show that the removal of coal by a third party from land adjacent with the plaintiff's and on a lower level had any effect on plaintiff's land from beneath which plaintiff removed coal, a prayer is properly refused which instructs the jury that if plaintiff's land was liable to slip in that direction, and that the injury was caused by the working of the neighboring mine, then the plaintiff cannot recover.    The prayer is also defective in that it does not exclude defendant's participation in the injury.

When the plaintiff has shown that his land, from under which defendant removed coal, cracked in many places; that cracks and crevices also appeared in the walls of the dwelling house, barn, etc., evidence is admissible to show what the market value of plaintiff's house was before it was damaged, and its value afterwards, and what injuries the removal of the coal had occasioned.

When the injury to the plaintiff's land and house caused by the defendant's wrongful act in removing the subjacent support is permanent in its nature, the measure of damages is the diminution in the market value of the property, and not the cost of repairing it, when such cost would be greater than the diminution in value, or when the repairing of the house would be practically impossible.

*Decided January 11th, 1911.*


Appeal from the Circuit for Allegany County (HENDERSON, J.), where there was a judgment on verdict for the plaintiff for $1,500.

*Plaintiff's Second Prayer.*—If the jury find for the plaintiff then in estimating the damage the jury are to consider

the market value of the premises before the happening of said injuries as compared with the present market value of said premises in so far as they may find the market value has been reduced by injuries to the surface and to the improvements thereon, as set out in the plaintiff's first prayer, and allow to the plaintiff such damages as will compensate him for such injuries to his property. (*Granted.*)

*Plaintiff's Third Prayer.*—Even if the jury find that the defendant mined and pillared the coal under the said premises in a skillful manner, yet if the jury find that the defendant in such mining failed to leave sufficient support for the surface and that thereby the injuries were caused, then the plaintiff is entitled to recover. (*Granted.*)

*Defendant's Second Prayer.*—That the jury cannot under the pleadings and evidence in this cause allow anything for the reduction of moisture in the surface, even though they should believe that the reduction of the moisture in the land was the direct result of the mining of the coal under the land of the plaintiff. (*Rejected.*)

*Defendant's Third Prayer.*—If the jury shall believe that the damages claimed to have been done to the property of the plaintiff were occasioned by a slip in the hill upon which the plaintiff's land was situated, then the plaintiff is not entitled to recover in this cause; provided they further find that said slip in the hill was caused by natural causes or by causes over which the defendant had no control or by both of said causes together, and not by the defendant undermining and pillaring said coal. (*Granted as modified.*)

*Defendant's Sixth Prayer.*—If the jury shall find that the pillaring of the coal under the house and barn of the plaintiff was completed by the first day of August, 1906, and that the pillaring under the remainder of the plaintiff's property was completed by the first day of February, 1907, and that as soon as the pillaring was done the roof of the mine broke down as was testified to by the witnesses, and that the cover over the vein of coal worked by the defendant was about four

hundred feet in thickness, and that no cracks appeared in the surface until May, 1907, and that subsequently to the pillaring by the defendant that the Davis Coal & Coke Company pillared its mines, and that following the pillaring of the mines of the Davis Coal & Coke Company the cracks appeared in the plaintiff's property, and that the property of the Davis Coal & Coke Company lay down the hill from the land of the plaintiff and on a lower level, and that the strata of rock dipped down from the land of the plaintiff towards the land of the Davis Coal & Coke Company on a grade of from ten to twenty feet in the hundred, and that the strata were composed of a series of coals, limestones, cres, shales, sandstones and fireclays, and that there was a liability to slip in such strata one over the other, then if the jury should find that the damage to the plaintiff's property was caused by the working of the mines of the Davis Coal & Coke Company ,the plaintiff cannot recover in this cause.    (*Rejected.*)

*Defendant's Seventh Prayer.*—If the jury shall find that there were cracks in the hill through the property which the plaintiff now owns, or immediately above the same up the hill from said property, some 14 years ago, and that said cracks appeared before any of the lower seams of coal under the plaintiff's property or any of the adjoining property had been worked, and that there was a tendency, on account of the formation of the hill on which the plaintiff's property was located to slip and slide, and if the jury should find that the injury to the plaintiff's property was occasioned by the slipping and sliding of the hill, then they cannot find a verdict for the plaintiff in this cause.    (*Rejected.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Ferdinand Williams* and *D. Lindley Sloan,* for the appellant.

*Albert A. Doub* (with whom was *A. Taylor Smith* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee sued the appellant for damages alleged to have been sustained by him by reason of the appellant removing the coal which supported the surface owned by him in a tract of land containing fourteen acres. The property was conveyed to the plaintiff in 1897, "except, however, all coal and other minerals on or underlying said above granted property to the same extent and in like manner as excepted in the said deed from Maria Reese *et al.* to Daniel Ritchey and Stewart Arnold, above described." In the deed referred to is this reservation: "The parties of the first part reserve to themselves, their heirs and assigns, all coal and other minerals that have been on may hereafter be found on or in the said lands, together with the right to mine and remove the said coal or minerals at such place or places as may appear to them, the said first parties, their heirs or assigns, most suitable and convenient by tramroad, plane and dump houses or otherwise," etc.

The first four bills of exception embrace rulings of the trial Court on the admissibility of evidence, and the fifth presents its action on the prayers. The plaintiff offered three prayers, which were granted, and the defendant offered eleven, the first, fourth, fifth, tenth and eleventh of which were granted as offered and the third and eighth as modified, and the second, sixth, seventh and ninth were rejected.

Before passing on the exceptions separately, it will be well to ascertain what the law is as between the owner of the surface and the owner of the minerals, when those estates have been severed by such provisions or reservations as those now before us. This is the first time this Court has been called upon to pass on the doctrine of subjacent support, where the surface and subjacent estates are owned by differ-

ent persons. The general rule of law is that when the estate in minerals "in place," as they are sometimes spoken of in their natural bed, is severed from the estate in the surface, the. owner of the latter has an undoubted right of. subjacent support for the surface, and the owner of the estate in the minerals is entitled to remove only so much of them as he can take without injury to the surface, unless otherwise authorized by contract or statute. There have been some discussions in the books as to the reasons upon which the rule was founded, but we have seen no case in which it has been unqualifiedly denied. Even in *Griffin* v. *Fairmont Coal Co.,* 59 W. Va. 480, 53 S. E. Rep. 24, 2 L. R. A., N. S., 1115, which has gone as far in sustaining the right of the owner of the minerals to remove all of them as any decision we have found, the general doctrine is recognized.

Without referring to the English cases upon which the original decisions in this country were based, the general rule announced above is sustained by many of the Courts of this country—the cases in Pennsylvania, where so much mining has been done, being especially numerous. Amongst others are *Williams* v. *Gibson,* 84 Ala. 228, 4 So. Rep. 350; *Collinsville Granite Co.* v. *Phillips,* 123 Ga. 830, 51 S. E. 666; *Wilms* v. *Jess,* 94 Ill. 464; *Lloyd* v. *Catlin Coal Co.,* 210 Ill. 460, 71 N. E. 335; *Yandes* v. *Wright,* 66 Ind. 319; *Mickle* v. *Douglas,* 75 Iowa, 78, 39 N. W. 198; *Erickson* v. *Michigan Land & Iron Co.,* 50 Mich. 604, 16 N. W. 161; *Chicago, etc., R. Co.* v. *Brandau,* 81 Mo. App. 1; *Marvin* v. *Brewster Iron Min. Co.,* 55 N. Y. 538; *Burgner* v. *Humphrey,* 41 Ohio St. 340; *Jones* v. *Wagner,* 66 Pa. 429; *Coleman* v. *Chadwick,* 80 Pa. 81; *Carlin* v. *Chappel,* 101 Pa. 350; *Williams* v. *Hay,* 120 Pa. 485; *Pringle* v. *Vesta Coal Co.,* 172 Pa. 438, 33 Atl. 690; *Robertson* v. *Youghiogheny River Coal Co.,* 172 Pa. 566, 33 Atl. 706; *Noonan* v. *Pardee,* 200 Pa. 474, 55 L. R. A. 410, 50 Atl. 255; *Youghiogheny River Coal Co.* v. *Allegheny National Bank,* 211 Pa. 319, 60 Atl. 924; *Miles* v.

*Penn. Coal Co.,* 217 Pa. 449, 63 Atl. 1032 (annotated in 10 *Am. and Eng. An. Cases,* 874). A number of the English cases are cited in the notes to *Trinidad Asphalt Co.* v. *Ambard* (1899), A. C. 594, to be found in 6 *Am. and Eng. Dec. in Eq.* 643, and in some of the cases referred to above, and we will not make further reference to them.

Although the rule has been so generally adopted, the parties can modify it or avoid its application by inserting provisions in the grants or leases which, expressly or by necessary intendment, relieve the owners of the minerals of the duty to furnish subjacent support, and in many of the cases which have been before the Courts, the question has been whether that was done by the particular provisions, and, if so, to what extent. We have quoted above those which must govern in this case.

There are many decisions in which provisions very similar to these have been held not to be sufficient to relieve the owners of the minerals of their duty to support the surface. In *Mickle* v. *Douglas, supra,* there was a lease with the right to mine, "all the coal;" in *Burgner* v. *Humphrey, supra.* there was a grant of "all the mineral, coal, iron ore, limestone, and all other minerals," with the right to enter upon the land and search and explore thereon for said minerals, coal, etc., "and when found to exist on said land to dig, mine, and remove the same therefrom;" in *Horner* v. *Watson,* 79 Pa. 242, the grant was all the coal, with the right to enter on the lands for the purpose of "mining, excavating and removing said coal;" in *Carlin* v. *Chappel, supra,* the deed of the surface reserved "all the coal," with the right of ingress, egress and regress, "for digging, mining, excavating and conveying away said coal;" in *Weaver* v. *Berwind-White Coal Co.,* 216 Pa. 195, 65 Atl. 545, the grant was for "all the merchantable coal in and underlying all that tract of land" for which the right of surface support was claimed, excepting five acres under the buildings and spring, the usual mining rights, were granted "with the

right to mine and carry away all the said coal, and with all the mining rights and privileges necessary or convenient to such mining and removal of the same." See also *Dignan v. Altoona Coal and Coke Co.,* 222 Pa. 390, 71 Atl. 845, one of the latest on the subject.

In those cases it was held that the right of subjacent support was not released in express terms or by necessary implication by the words used. Many others in accord with that position might be cited, but we will only refer to the note in *Griffin v. Fairmont Coal Co.,* 2 L. R. A. N. S. 1115, and the note to *Miles v. Penna Coal Co.,* 10 *Am. & Eng. An. Cases,* 874, where many of them are collected. The case of *Miles v. Penna. Coal Co.* is an illustration of how such right can be released, while on the other hand that of *Youghiogheny River Coal Co. v. Hopkins,* 198 Pa. 343, 48 Atl. 19, shows how careful that Court is to sustain the right, unless it is released by express words or necessary implication. The case of *Griffin v. Fairmont Coal Co., supra,* is the only one we have found where language similar to that in the reservation in the deed now before us was held to be a release. When the doctrine or right of subjacent support is recognized, as it is with practical unanimity by the authorities, it seems to us to be far better to require those who desire to enter into stipulations by which the one party to the transaction is to part with the right which the law gives him, and the other is to be relieved of a duty which the law imposes upon him, to use language that will necessarily import or clearly express such intention. It should be either by express words or necessary implication, and in our judgment the language used in this reservation was not sufficient to relieve the appellant of its duty to support the surface. It is also held by the authorities that a failure to leave sufficient support for the surface is negligence and may be so declared on. *Yandes v. Wright, supra; Jones v. Wagoner, supra; Carlin v. Chappel, supra.*

Having thus ascertained the rights and duties of the respective parties to this suit, by reason of the ownership of the surface by the plaintiff and the coal by the defendant, we will now consider the particular grounds of complaint urged against the rulings of the Court by the appellant. The first and second exceptions and the defendant's second prayer may be considered together. In the examination of the witness, Jacob D. Wilson, he was asked this question: "Was there any difference in the surface as to moisture before and after the fall and breaks of the surface?" That was objected to, and the plaintiff proffered to show, "that the breaks or falls were such that every time it rained the rain ran down these crevices or spaces in the breaks and ran off the surface; and the result was that the land would not hold any moisture. It would dry out immediately afterwards, and the soil became in a hard condition that would amount to a drought, except at such times of continued rain. The land would not hold any moisture, and therefore ruined and of no value." The objection was overruled and that ruling constitutes the first bill of exceptions. The witness answered, "Yes, sir; it was," and then followed this testimony: "Q. What was the difference? A. The steam comes up these cracks, as I told you, and snow all melts, and it don't hold no moisture—the water goes straight through. Q. Where does the water go when it rains? A. Down those cracks. Q. Do you mean to say it is drier afterwards? A. Yes, sir; it used to be two or three days before I could plow, but now I can plow the next day." He had previously described the breaks with particularity.

When Miss Kearney, plaintiff's sister, was on the stand, she described the cracks, which she said they first noticed in May, 1907. She said they "started over towards the barn and ran across the level, and stopped for a long time." "Then it started and went down behind the barn." She "was milking in the barn at the time and the wall split open and a tin cup went down sidewise into the crack. The barn

tipped over four or five inches on one side of the foundation.
No other disturbance for two months, when another crack
came in the foundation, one that you could stick your finger
in. About a year afterwards the house began to crack. It
has kept up more or less ever since. . Just a week ago the
ground opened just below the house—took several panels
out of the fence." She was asked the question: "How does
the soil seem to be now as compared to what it was before
the injury as to moisture—I mean the soil generally ?" That
was objected to and the same proffer was made as above, in
reference to the witness Wilson. The objection was over-
ruled and the witness answered, "That the soil had dried
out, was hard, much harder than formerly, and they now
have to water it." She said the cows would step into the
cracks and hurt their legs—that the break took a whole row
of trees. She also said, "When it rains, there is no stop
to it. It seems like it runs down the cracks." "The cracks
are so large that a wagon could run through. It just looks
like a wagon road running through. They open up on this
side, and go a little piece, and then on the other, and the
middle piece drops in." "Something like steam or smoke or
fog rises from the holes, or crevices at times. You can drop
a rock down and hear it sound as if it came from the depths
of the earth."

The defendant by its second prayer asked the Court to
instruct the jury "that they cannot under the pleadings and
evidence in this cause allow anything for the reduction of
moisture in the surface even though they should believe that
the reduction of the moisture in the land was the direct re-
sult of the mining of the coal under the land of the plain-
tiff." It will be observed that that prayer asked the Court
to instruct the jury that they could not "allow anything for
the reduction of moisture in the surface." The testimony
shows that the depth of the cover was three hundred and
fifty or four hundred feet, and it was admitted at the open-
ing of the case that "all the coal to a depth of six feet

under the plaintiff's property was removed by the defendant company after the year 1906, and that no stumps or pillars were left, and that this was done before the injuries to the surface." The rule is well established that the owner of the coal is not liable to the owner of the surface for injuries resulting from the diversion of what are spoken of as hidden streams, caused merely by the removal of the coal. In *Coleman* v. *Chadwick*, 80 Pa. 87, relied on by the appellant, the Court said: "So far as we can judge from the record, the loss of the plaintiff's springs was occasioned by the ordinary operation of mining, and would have occurred though no part of the surface had been broken. Mining must interfere, more or less, with those subterranean streams and percolations of water which appear upon the surface as springs; to say that the owner of the substrata shall be accountable in damage for their disturbance, is to say that he shall have no use whatever of his minerals, for, without interfering to some extent with such waters, mining is impossible." That seems to us to be a very sensible and necessary rule to adopt.

But the principle referred to in *Coleman* v. *Chadwick* does not reach the question here involved, for, conceding to its full extent that no damage can be recovered for the diversion of the water, if the coal is worked in the ordinary and proper way, if it is so worked as to take away the support of the surface, then it is not worked in a proper way. This prayer proposed to disallow anything for the reduction of moisture in the surface, while it must be clear that if the loss of moisture is the result of the breaks in the surface, caused by want of the support which the defendant owed the plaintiff's surface, then the loss of moisture is like any other damage which is the result of that wrong done the plaintiff. The prayer was too broad.

The cases in Pennsylvania show the distinction we have pointed out. In *Kistler* v. *Thompson*, 158 Pa. 139, 27 Atl. 874, the Court said: "Nothing could be more clear or more correct than the charge of the learned Court below to the

jury on all the legal aspects of the case." JUDGE McILVAINE, in the lower Court, in speaking of a spring which the plaintiff claimed was valuable to her property, said: "In 1889 this spring disappeared, and she alleges that the spring disappeared by reason of the subsidence of the surface, and the cracking of it, on account of the support being withdrawn by those that mined the coal, they having failed to leave sufficient coal to support the surface." He then went on to explain the duties and liabilities of the owner of the coal when the title to the surface is in another party, and he said he had the right to remove the coal, "and if, in so doing, he should interfere with the hidden streams of water that may be running through the earth, and thus drain the spring of another, he would not be liable for damages, if the spring failed simply because, in the ordinary operation of the mine, some subterranean stream was tapped, and by this means the water, in place of flowing to the opening in the ground where the spring was, flowed to some other place." He then went on to say however, that notwithstanding his right to remove the coal, he is required to leave enough to support the surface, or if he takes all of it out, he must substitute sufficient supports to keep the surface in place, and he added: "Now, if he fails to leave sufficient support, * * * and by reason of this failure to leave sufficient support the ground sinks, subsides and cracks, and that sinking and cracking divert a stream of water, then he would be liable, because that would be the direct result of his wrongfully withdrawing the support that is necessary and sufficient to sustain the surface." In *Rabe* v. *Shoenberger Coal Co.,* 213 Pa. 252, 62 Atl. 854, annotated in 5 *Am. & Eng. An. Cases,* 216, the plaintiff had a dairy farm which was usually well supplied with water. It had twelve springs on it, with water in every field. The plaintiff claimed that five of the springs were destroyed by the cracks in the land. The question was, "how much was the farm depreciated in value by the loss of the springs?" The controversy there was as to the measure of damages, but

the Court expressed no doubt about the right to recover for the loss of the springs destroyed by the cracks in the land. In *Weaver* v. *Berwind-White Coal Co., supra,* the right of the plaintiff to recover for loss of springs, which resulted from the removal of the surface supports, was fully recognized.

So without further discussing that question we think there was no error in the rulings in the first and second bills of exception, or in rejecting the defendant's second prayer.

We do not find any error in rejecting the sixth prayer. In the first place, Mr. Brophy, the president of the appellant company, who is a skilled and intelligent mining engineer and familiar with the property, testified that he did not know whether the removal of the coal by the Davis Coal and Coke Co. had any effect on this property. The jury certainly could have done nothing but make a pure guess on that subject. But regardless of that, the prayer does not exclude the defendant's participation in the injury. If the tendency was, as the prayer proposed to submit to the jury, for the starta under the plaintiff's property, which dipped towards the land of the Davis Coal and Coke Co., on a grade of from ten to twenty feet in the hundred, to slip in that direction, there would seem to be all the more reason for the appellant to leave such support as was necessary to protect the surface of the plaintiff. It might be that with a surface of 350 or 400 feet, there would not ordinarily be so much damage by the excavation of six feet, but if that coal was so situated that upon the removal of the coal from the Davis Coal and Coke Company's property the ground would slide in that direction, the removal of the support in the Kearney property would probably be more disastrous than it would otherwise have been. So without further discussing that, we think the appellant got all it was entitled to by the granting of its third, fourth, fifth, eighth, tenth and eleventh prayers, and cannot complain of the rejection of its sixth, seventh and ninth prayers.

Nor do we think that the appellant was injured by the use of the word "premises" in the plaintiff's prayers, instead of in terms reminding the jury that the defendant owned the mineral rights. We cannot assume that a jury engaged in hearing a case for three or four days would not better understand what they were trying—especially when other prayers, which were granted, explained it fully.

It must be admitted that the rulings on the questions presented by the third and fourth exceptions and the plaintiff's second prayer were not so free from doubt as the others, but when they are carefully considered, they do not seem to be subject to the objections that have been urged against them. The question in the third exception was, "What was the market value of that house of Mr. Kearney's before it was damaged by those breaks and falls?" Just before it was propounded to Mr. Duckworth, the witness, he had testified that, "I am familiar with market value of houses in that vicinity, and have worked as a carpenter occasionally and am generally familiar with prices paid for houses of that kind. Have been in Kearney house before damage was done, walls were broken, plastering cracked and house out of plumb." He said in answer to the above question, "Well, I suppose it was worth about $1,000." The question in the fourth bill of exceptions was, "What was the value of the house at the time you examined it last fall by reason of the damage which was inflicted upon it by breaks and cracks in the walls?" To which he answered, "Well, I guess it would be about half the value. About $500." It will be observed that the last question was as to the value of the house by reason of the damage which was inflicted upon it by breaks and cracks in the walls. It was in reality simply an effort to show the depreciation by reason of the injuries, and the prayer, which we will ask the reporter to publish, directed the attention of the jury to that particular question.

It was undoubtedly proper to show what the injuries to the house were. Its condition had been described by pre-

vious witnesses. One of them had said, "Since 1907 the Kearney house has been going down; the house is leaking, walls are cracked, base broken, foundations broken in several places, house two or three inches out of plumb?" A sister of the plaintiff who had lived with him said, "We are not living in the house now, because it is dangerous. When we first came here, me and my mother and father and three brothers lived here, and now there is only me and my mother and my brother living here until last November. My brother remains in the house still * * *. We left it because it was dangerous, but my brother stays there in one room in the back of the house. We stood it as long as we could. It has been getting worse ever since. In some places the cracks in the foundation were big enough for a wagon to pass through." That same witness testified, after speaking of the barn tipping over four or five inches, and also of another crack, "About a year afterwards the house began to crack. It has kept up more or less ever since. Just a week ago the ground opened just below the house—took several panels out of the fence." Mr. Brophy, the president of the defendant, said he had sent Mr. Fahey to the Kearney house and to the Wilson house (another one injured) and testified, "I instructed him to wedge them up, and keep them in plumb, so as to do as little damage as possible. We felt that we were probably responsible for the damages, and were willing to make it good, but we did not repair it. They would not accept any settlement for repairs." There was testimony that the land alone had decreased in value $2,000 to $2,100.

There was, therefore, ample evidence tending to show that the farm was seriously and permanently injured, and that the house was likewise not only seriously injured, but was, up to the time of the trial, continuing to crack and get worse. Under those circumstance it would seem strange if the law furnished no relief but repairing the house. There was apparently no attempt on the part of the defendant to show that it could be repaired. The statement of Mr.

Brophy above referred to rather indicates that it could not be, beyond possibly checking the damage, although no question was raised as to whether that could be or ought to have been done. If it could have been repaired, unquestionably a house on a tract of fourteen acres, as fertile and productive as this was before the subsidence, would not be worth as much as it formerly was, when the tract was in such condition as the testimony shows this was in after the subsidence, and up to the trial was even getting worse. If the house had not been injured, it would not have been worth as much as it formerly was, when the land was cracking near it to the extent this was, the barn was injured, and the soil no longer fertile. Under all these circumstances there can be no doubt that the evidence showed that both the land and house were permanently injured, and it was practically impossible to restore the house to its former condition by repairs. Does the law then, under those circumstances, deny a recovery for the house for anything but the cost of repairs? Or, to state it another way, does the law require one whose house is thus injured, either to do a useless thing, or let the wrongdoer go unpunished? For, although those interested in the defendant doubtless greatly regret that the plaintiff was injured, and would not willingly have injured his property, the law treats the company as a wrongdoer, as it had no right to remove the supports.

We have no case in this State applicable to such conditions. It is true that in *Brown* v. *Werner*, 40 Md. 15, which was an action for negligently injuring the plaintiff's house by digging too near the wall, while deepening the cellar on the adjoining lot, it was said, "The action was for a *tort*, and the plaintiff was entitled to recover for all damages naturally or necessarily flowing from the wrongful acts of the defendants; and if his house was injured by the careless and negligent manner in which the appellants improved the adjoining house, he was entitled to recover such damages as would be sufficient to reinstate the wall and the house in

as good condition as they were prior to the injury." And in *Con. Gas Co.* v. *Getty,* 96 Md. 691, which was a suit for damages to a house, caused by an explosion of gas, the same rule was stated. But in neither of those cases was there any difficulty in restoring the house to its former condition. When that can be done, and the injured house can be put in as good condition as it was before the injury, it is undoubtedly the safer and better rule of damages, but when the injury is of a permanent character, and repairing will not compensate the owner for the injury it would be a denial of justice to limit his recovery to something that would be of no practical use. As was said in the *Redemptorists* v. *Wenig,* 79 Md. 348: "The injury was, in the judgment of the witnesses, permanent, and thereby affecting the value of his land, and under such circumstances the jury had the right, in estimating the damages to take into consideration the loss suffered by the appellee in the depreciation in the value of his land." In *Belt R. R. Co.* v. *Sattler,* 102 Md. 595, the distinction between permanent and temporary depreciation in the value of property is also recognized. So although, when repairs can restore the property to its former condition, that is the safe and proper measure of damages, yet if the testimony shows that cannot be done, and at the same time justice be done to the injured one it is proper to adopt another rule.

The distinction is well illustrated by the Pennsylvania cases in actions of this character. In *Noonan* v. *Pardee, supra,* the plaintiff had erected a dwelling house—"the ground under it and in the neighborhood subsided, leaving a saucer-like depression about three feet deep in the middle, and extending over about two acres." The Court said: "If plaintiff be entitled to recover, his measure of damages is the actual loss he has sustained to his land, including the building thereon, by reason of the cave-in. The difference in the market value before and after the injury in this class of cases is not the true rule. In this case, under the evi-

dence, perhaps it worked no injustice; but in many cases it
would do so."

But in *Rabe* v. *Shoenberger Coal Co., supra,* the Court
said: "It is sufficient to say that the sound rule is, that
where there is a permanent injury to real estate, the extent
of the damages caused thereby is to be measured by the re-
sulting depreciation in the value of the property.    Per-
manency of injury is the proper test for the application of
this rule."    It is true it is also said: "The principal injury
of which complaint was made was the destruction of five
springs of water.    This injury was permanent and irremedi-
able, as was also any damage to the surface which might
render it less available for building purposes.    Other in-
juries, such as the sinking of the dwelling house and the
opening of cracks across the private right of way, were
remediable.    For the latter, the costs of repair or restoration
is obviously the measure of the damage."    But the Court
pointed out the distinction and stated clearly that when the
injury was permanent the depreciation of the market value
was the measure of damages.

Then in *Weaver* v. *Berwind-White Coal Co., supra,* it was
said: "The rule is settled that the measure of damages for
permanent and irremediable injuries to land caused by fail-
ure to give surface support is the actual loss in the deprecia-
tion of the value thereof.    The permanence of the injury is
the test for the application of the rule, *Noonan* v. *Pardee,*
* * *.    If the injury is reparable the cost of repairing may
be recovered, and if the cost of repairing is greater than the
diminution in the market value, the latter is the true meas-
ure of damages.    In all such cases just compensation for
the loss sustained by the trespass is what the injured party
is entitled to recover.    When the injury is permanent, the
measure of damages is the difference in market value before
and after the injury"—citing *Vanderslice* v. *Philadelphia,*
103 Pa. 102; *Fulmer* v. *Williams,* 122 Pa. 191; *Williams* v.
*Fulmer,* 151 Pa. 405; *Thompson* v. *Traction Co.,* 181 Pa.

131.   It then said: "In the case at bar the principal injury complained of was the destruction of the springs of water, although subsidence in the surface and disturbance of the buildings entered into the elements of damage claimed * * *. On the whole we think the testimony produced on the part of the plaintiff came fairly within this rule.   It was directed to the point of showing the actual loss to the owners by reason of injury to the surface, loss of the springs, and damage to the buildings."

There is a note to *Rabe* v. *Shoenberger Coal Co.,* in 5 *A. & E. An. Cases,* 219, where many cases on both sides are collected, and that author says: "The prevailing rule in the United States for measuring the damage to real property for an injury to its lateral or subjacent support, and the rule which formerly obtained in England, appears to be, as announced in the reported case, the diminution in the market value of the property injured."   In 18 *Am. & Eng. Ency. of Law,* 552, it is said: "It has been held that the rule as to the measure of damages where a building has been injured by the negligent removal of its lateral support is the same as where the recovery is for the removal of the support of the land in its natural state; that is, the measure of damages is the diminution in value of the property injured, and not the cost of repairing or restoring it."   In 13 *Cyc.* 150, it is said: "As a general rule the measure of damages in actions for injuries to real property is the difference in value before and after the injury to the premises, although some of the Courts have considered the measure of damages as the difference in the rental value of the property injured * * *.   In some cases the cost of repair or restoration has been adopted as the measure of damages; but in such event the cost of repair must be reasonable and bear some proportion to the injury sustained."

This opinion has already reached such length that we will not cite other cases (many of which can be found in the references we have given), or discuss the English cases, ex-

cept briefly to refer to *Tunnicliffe* v. *West Leigh Colliery Co.* (1906), 2 Ch. 22, and to that case in the House of Lords, where the parties names are reversed, (1908) A. C. 27. In the former the Court of Appeal held that in suits of this character, "the depreciation in the market value of the property attributable to the risk of future subsidence is a proper element of the damages recoverable." But in the latter, the House of Lords reversed the case, and adopted the contrary view and directed that the judgment of the lower Court be restored. In that judgment the learned Judge said: "Even after the expenditure of the amount allowed by the official referee for repairs, the appearance and condition of both mills will be very different from what they were before the subsidence." The House of Lords approved of the action of the lower Court, and in the opinion of LORD ASHBOURNE he said: "I am glad, however, to note that SWINFEN EADY, J., did not limit his judgment to the 1300£ for repairs, but has sanctioned a reference back to the official referee to 'assess the damages in respect of depreciation of the premises.' As the learned Judge says: 'A mill which has been much cracked and injured, and with walls bulging and out of plumb, although repaired, is manifestly not of the same selling value as before it was injured. The repairs are very far from entirely reinstating it, and the loss to the plaintiffs is the same, whether the mill be sold and the loss realized, or whether the mill be retained by the plaintiffs, its value being reduced.' "

As will be seen by one of the cases cited above (*Weaver's case*), and there are many others to the same effect: "If the injury is reparable the cost of repairing may be recovered, and if the cost of repairing is greater than the diminution in the market value, the latter is the true measure of damages." So in a case where the cost of repairing exceeds or approaches (as indicated by the evidence) the diminution in the market value, it must be relevant to prove that value, for otherwise there would be no way of determining whether the cost of

repairing was greater than the diminution in value, and hence for that reason it was not error to allow it to be proved—indeed justice to the defendant might require it, under the above rule, if the cost of repairing exceeded it.

So under all the circumstances we are of the opinion that there was no reversible error in admitting the testimony embraced in the third and fourth bills of exception, and that the plaintiff's second prayer was sufficiently guarded to prevent doing the defendant injustice. As the testimony shows that the injury to the land is not only of a permanent character, but depreciates the value considerably more than one-half, which of itself must affect the value of the house, and as it also shows, with no evidence to the contrary, that the house was permanently injured, and was still continuing to develop such conditions as to make repairs of little, if of any, use, we are of the opinion that the difference between the market value of the premises (taken as a whole), before the injury and their present market value, in so far as the jury found it "has been reduced by injuries to the surface and to the improvements thereon," was the correct measure of damages. It follows that the judgment will be affirmed.

> *Judgment affirmed, the appellant to pay the costs, above and below.*