DEPARTMENT OF FORESTS AND PARKS, ET AL. *v.* GEORGE'S CREEK COAL & LAND COMPANY

[No. 223, September Term, 1967.]

*Decided May 28, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Thomas A. Garland, Assistant Attorney General,* and *Rich-
ard C. Rice, Special Assistant Attorney General,* with whom
were *Francis B. Burch, Attorney General,* on the brief, for ap-
pellants.

*Robert A. Reinhart* and *William Walsh,* with whom was
*William C. Walsh* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Unless the appellants (the State) and the appellee (the
Company [1]) can come to terms in respect of compensation to
the Company for the surrender of its mineral rights, our de-
cision in this case will result in the scarification and uglification
of most of the upper eastern face of Big Savage Mountain, one
of the lesser glories of Garrett County. The facts, in large part
undisputed, are as follows.

In 1910 the Company acquired the fee simple title to a tract
of land containing 8,621¾ acres known as "Beattys' Plains,"

---

**1.** Including its predecessor in title, George's Creek Coal Com-
pany, Inc., which conveyed its interest in the land to the appellant
in December 1952.

on Big Savage Mountain, near the boundary line between Garrett and Allegany counties. Some 20 years later it conveyed the tract to McMillen. In the deed there appears an exception and reservation, reading as follows:

> "Excepting, however, from the operation of this deed, and reserving to the George's Creek Coal Company, Incorporated, its successors and assigns, *all the coal, clay and other minerals, and all the oil and gas underlying said land hereby conveyed,* together with the right *to enter in, upon and under said land and to mine, excavate* and remove all said coal, clay and other minerals, and said oil and gas, and to transport and haul the same to market; and also the right to enter in, upon and under said lands and to transport and haul the coal, clay and other minerals and the oil and gas from other lands and under and over and across said land; and also the right to enter in, upon and under said land and to make, construct and maintain road ways, *excavations,* tunnels, drain ways, tracks, pipe lines, power lines, tipples, and any and all other like structures and to do any and all things necessary or convenient for the mining and removing of said coal, clay and other minerals and said oil and gas and the coal, clay and other minerals and the oil and gas from other lands; and also the right to enter in, upon and under said land and to construct and maintain poles, towers and wires and other like equipment for carrying electricity for any purpose whatsoever; *all without being in any manner liable for the breaking or subsidence of the surface* of said land or for any injury or damage done to the *overlying surface* thereby or to anything therein or thereon, by the exercise of the rights hereby excepted and reserved, whether or not the same be caused by or due to the negligent manner in which said mining operations are conducted or said rights are exercised.
>
> "And also excepting from the operation of this deed and reserving to the said The George's Creek Coal

Company Incorporated, party of the first part, its successors and assigns, so much of the land hereinbefore described as may be necessary for a railroad right of way having a road bed sixty (60) feet wide, together with such other land which may be necessary for adequate slopes, cuts and fills for the same, the location and length of said railroad and right of way to be solely at the discretion and in the judgment of the said party of the first part, its successors and assigns." (Emphasis supplied.)

In 1931 the land was rocky, unimproved and covered with timber. It rose from George's Creek (elevation 1400 feet), at grades ranging from 15% to 25%, to the top of Big Savage Mountain (elevation 2900 feet). McMillen, who was in the timber and pulpwood business, began logging operations immediately after taking title. In February 1937, having "clearcut" all of the timber, McMillen conveyed, subject to the exception and reservation of record, approximately 5800 acres of the tract to the United States for about $1.00 per acre. In December 1954 the United States sold the 5800 acres, along with other land in Garrett County, to the State of Maryland. It is now part of the Savage River State Forest. The conveyance from the United States to Maryland, which of course was subject to the exception and reservation of record already mentioned, contained the following additional restriction:

"This conveyance is also made subject to the condition that the above-described land shall be used for public purposes, and if at any time said land ceases to be so used the estate hereby conveyed shall immediately revert to and become revested in the United States."

In December 1964, the Company applied to the Board of Public Works for permission to remove the coal by strip mining. After a hearing held 14 December the Board granted permission (one member dissenting) subject, however, to the approval of the Department of Forests and Parks, which, after consideration of the application, in February 1965, refused to give its approval. The Company, on 14 November 1966, filed,

in the Circuit Court for Garrett County, its bill for a declaratory decree against the Board of Public Works, Spencer P. Ellis, the director of the Department of Forests and Parks, and two mortgagees. The case was heard before the chancellor, Hamill, J., on 24 April 1967. The decree declaring the Company to be entitled to strip mine the coal and directing the issuance of a permit was filed 14 June 1967 along with the chancellor's opinion. We have before us the State's appeal.

At the trial below F. R. Zacher, a mining engineer, testified there is beneath the surface of about one-half of the property 7,371,000 tons of bituminous (soft) coal. He was of the opinion that 2,585,000 tons could be recovered by strip mining,[2] 596,000 tons by the auger method and 4,190,000 by deep mining. Asked how the coal could be mined economically, he said:

> "To open a deep mine, I do not believe it would be economical unless first, a bench was established by strip mining wherein the surface would be removed and the coal removed and create a, what in strip mining terminology is known as a high wall. * * * [I]t would be my opinion that the crop line would be opened, there would be reservation of coal along that created high wall for auger mining and there would be solid areas left along the high wall from which you would enter with deep mines, and these deep mines would go in, down the hill, they would mine their allotted area, retreat and then a second mine and a third and a fourth would be opened, rather than tying up everything in one great big single mine for the entire field of coal. Primarily, though it would have to be stripped, I believe, before it would be economical to mine any of it."

Mr. Zacher testified that the stripped area would total about 409 acres and that an additional 250 acres would be disturbed.

---

2. We shall not undertake an elaborate discussion of the evils of strip mining. For details see, U. S. Department of the Interior, *Study of Strip and Surface Mining In Appalachia* (Interim Report, 1966).

The strips, of course, are not contiguous. They follow the coal seams. He also said strip mining had been known for "in excess of sixty years."

Frank T. Powers began his career in the mining industry in 1900. In 1918 he became a mine inspector for the State of Maryland. From 1949 until his retirement in 1962 he was the director of the Bureau of Mines. He testified that a lessee of the Company strip mined about 2000 tons of coal near Lonaconing, about 3 miles from the land under consideration, in 1917, 1918 or 1919, "either one of those three years." The only economical way the coal can be removed, he said, is by strip mining.

Chelsie Liller has a stripping operation in Garrett County. He has lived in Allegany County since 1909. He recalled that American Coal Company (the Company's lessee), in 1917, strip mined coal from Lonaconing to Barton, a distance of 3½ to 4 miles, and 2 to 3 miles from the Company's property. He remembered McMillen's logging operation. He said McMillen told him (Liller) that "He had no intention of ever holding it [the 5800 acres]. It was the timber he was interested in."

Spencer Ellis explained his department's opposition to the granting of the permit. We quote from his testimony:

"Q. Now, if this area is permitted to be strip mined, is this consistent with the purposes of the Department with this land? A. It is not.

"Q. Why not? A. Because the act of removing the overburden destroys the surface for public use. We cannot grow timber on an area that has been or is being actively strip mined. It has very little use for recreation. It certainly does not present a watershed protection program, and, of course, it has no available wildlife advantages or habitat for wildlife.

"Q. Now, Mr. Ellis, you have heard some testimony this morning from Mr. Zacher as to the amounts of coal that he estimates is under this land. There are certain amounts that can be deep mined. Now, does the Department object to the deep mining of this coal? A. We don't certainly like deep mining either. It does

have some detrimental effects on the environment. However, compared to surface mining, the detrimental effects are not as pronounced. So, if you are weighing one as against the other deep mining does not have much effect on surface damage as strip mining, but it has some unrelated or related things such as drainage, spoil and odor and things that are damaging to the area."

Clinton Irwin, the district director of the Department of Forests and Parks, supported Mr. Ellis. He said:

"* * * A. I would say in some areas it [strip mining] would have a very, very serious effect.

"Q. In what way? A. As has been mentioned by several witnesses before me, this is a mountainside, it's a side of largely the east face of Big Savage Mountain which runs an altitude of from about 2,900 feet and drops off all the way down at George's Creek at an elevation of perhaps 1,400 or 1,500 feet I would guess, but anyway it's—the grades on the mountainside are quite steep. I would guess in some places they would range up to 25 percent. The general procedure in strip mining on a mountainside is to strip with the crop right along the edge of the mountain following the cropline and depositing the overburden on the lower side. The general assumption is in strip mining is that the overburden will be replaced, back-filled so the land can be restored. However, when you are stripping along a mountainside and the grading gets beyond a certain percentage, it's almost impossible economically to get the overburden back in the cut."

Michael Rodevick, an engineer employed by the Department of Water Resources, testified strip mining the property would exacerbate the pollution of the adjoining streams. John E. Brodie, an assistant district forester, told of the difficulties involved in the reclamation of any area that has been strip mined.

The chancellor found that strip mining was "a known and

132

practiced method of removing coal in Allegany County in 1931" and that strip mining operations "were conducted in Maryland as early as" 1919. He went on to say:

"I am of the opinion that the terms and phraseology of this reservation are broad enough to include any known method of mining coal; that the contracting parties to the original reservation had no regard or concern for the surface of this rugged, mountainous and unimproved land, and their intention was to include in the aforesaid reservation any type of known mining operations, including strip mining."

I.

The State contends that since the language of the deed is clear there is no need to consider evidence of the attending circumstances in order to ascertain the intention of the parties and the true meaning of this agreement. If the grantor had intended to reserve the right to strip mine the coal, the State argues, it would have said so. The Company, on the other hand, insists the language of the deed is not clear and that its true meaning cannot be determined unless the circumstances attending its execution are taken into account. In reply to the State's contention that the deed must be construed most strongly against the grantor, the Company says the construction of a deed against the maker is applied only in circumstances where intention can be discovered in no other way, citing *Hodges v. Owings,* 178 Md. 300, 13 A. 2d 338 (1940), where it was said:

"Both parties agree that if the language of a deed be doubtful, it shall be most strongly construed against the grantor, but as said in *Zittle v. Weller,* 63 Md. 190, 196, 'this rule is to be resorted to, and relied on, only where all other rules of exposition fail to reach, with reasonable certainty, the intention of the parties.' And as said in *Maryland State Fair v. Schmidt,* 147 Md. 613, 621, 128 A. 365, 368, 'to ascertain its true meaning the situation of the parties and the circumstances attending the execution of the deed may be considered.' " *Id.* at 304.

We do not agree that the grantor intended to foreclose the right to remove its coal by strip mining simply because it did not use precisely those words in its deed. We do agree with the Company, however, that the language is not clear. Therefore, we shall take a look at the evidence in the record and perhaps from our consideration of it there will emerge what the parties to the 1931 deed intended in respect of strip mining.

It is important to remember that the Company had owned the land, in fee simple, for over 20 years before the deed to McMillen. It was rocky, remote, mountainous, unimproved, and generally inaccessible. Agriculture was impossible. But there was timber and, as was well known in that area, timber was McMillen's business. He had a planing mill at Westernport, 2 to 3 miles distant from the Company's land, where he dealt in dressed lumber and pulpwood. He intended only "to get the timber." He told Chelsie Liller that "he wouldn't be able to keep it because he couldn't get them [the County government] to cut the taxes on it * * * and he was going to unload it and let it go for taxes." There is little doubt that the removal of the timber was the only thing the Company and McMillen had in mind in 1931. Indeed, in the absence of such an arrangement, the Company would have been obliged to remove, and in the process destroy, most of the timber in the course of its stripping operations. One suspects that McMillen was given a deed, rather than the right to cut the timber, for the sole and deliberate purpose of shifting the tax burden to him. McMillen, as has been said, happily avoided the inevitable tax sale by selling to the United States for $1.00 per acre, a consideration somewhat excessive perhaps, considering the circumstances.

A close reading of the language used in the deed ought, per se, to banish any notion that McMillen had plans for the land, other than logging. Had he any such plans his acquiescence in the reservation of such broad and unrestricted rights by the grantor would be difficult, if not impossible, to understand. The Company *retained* the ownership of *all* "coal, clay and other minerals [including oil and gas]" beneath the surface and it reserved the right "to enter *in, upon and under*" the land and to "mine, *excavate* and remove *all*" of the coal and other

minerals. The right to haul coal and other minerals from other lands "under and over and across" the property is also reserved, as is the right to "make, construct and maintain roadways, *excavations,* tunnels, drain ways, tracks, pipe lines, power lines, tipples and *any and all like structures."* There is also reserved the right "to do *any* and *all things necessary or convenient* for the mining and removing" of the coal. "Poles, *towers* and wires * * * for carrying electricity *for any purpose whatsoever"* may be constructed and maintained. There follows the condition that the Company shall not be *"in any manner* liable for the breaking or subsidence of the surface * * * or for *any injury or damage done* to the overlying surface thereby or to any thing therein or thereon." Whatever land may be required for a 60 foot railroad right of way (not including slopes, cuts and fills), the location and length of which are to be "solely at the discretion and in the judgment" of the Company, is excepted. (All emphases supplied.)

The State does not contend that the language of the Company's exception and reservation forbids deep mining or auger mining yet neither of these methods is mentioned in *ipsissima verba.* The Company was certainly aware (as was McMillen, we think) of the fact that strip mining was a widely known and well understood method of recovering coal. In fact, the Company had participated in the strip mining operations between Lonaconing and Barton in 1918. Moreover, it would seem to be a fair assumption that it knew the coal was so placed that to recover all of it a combination of deep mining, auger mining and strip mining would have to be employed. We are not persuaded, because specific mention was made of none of the three methods, that one of them, strip mining, is forbidden to the Company.

While the question here presented is new to us, it has been a source of litigation in other states (especially Pennsylvania) within whose borders lies some part of Appalachia, *Commonwealth v. Fitzmartin,* 376 Pa. 390, 102 A. 2d 893 (1954), is such a case and it is remarkably similar to the case at bar. The land, in *Fitzmartin,* had been acquired by the Commonwealth "at a nominal price as an area for the conservation, protection and propagation of wild life." The surface was

"rocky, hilly and mountainous," and covered with second-growth hardwoods. There were no buildings, no permanent improvements, no railroads and no public highways on the land. The tract, aggregating 3471 acres, had been conveyed to the Commonwealth by 9 separate deeds in 1921 and 1923. Each deed contained the following reservation:

> "Excepting and Reserving *all the coal,* oil, natural gas, and other minerals, *in and under the surface of said land*; together with the exclusive and perpetual right of ingress, egress and regress into and upon said lands to examine, search for, mine, manufacture and prepare said coal, oil, gas and other minerals for market; to take, remove and transport the same therefrom as well as coal, oil, gas and other minerals from other lands; to build and construct shafts, drifts, air shafts, bore holes, gangways, headings, roads and drains in, through, upon and under said surface; to pump water from the mines and run same on said surface; to locate and erect such fans, engines, machinery, buildings, shafts, drafts, and other structures, with the necessary curtillage, as may be necessary for the convenient use, ventilation and working of the mines and works appurtenant thereto and to manufacture coke; to use sufficient and convenient portions of surface to deposit dirt and waste from the mines, and for the location and erection of miners' dwellings, tenements, office, stores and other buildings; *without any liability whatsoever for damages to said lands* or for injury to or diversion of waters flowing in, through, under and upon said land." (Emphasis by the Pennsylvania court.)

Even a hasty comparison of the *Fitzmartin* reservation with the reservation in the instant case demonstrates that the *Fitzmartin* reservation is narrower in scope and not nearly as specific. It was there contended that the lessees of the grantor had no "legal right to remove * * * [the coal] by the strip mining method." It was conceded the coal could not be obtained by deep mining. The Supreme Court, speaking through Justice Bell, observed:

> "This deed, like many instruments leasing or conveying coal lands or reserving rights therein, does not clearly set forth or define the rights of the parties. Where a deed or agreement or reservation therein is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the entire written instrument there in question, but also from a consideration of the subject matter and of the surrounding circumstances. Price v. Confair, 366 Pa. 538, 542, 79 A. 2d 224; see also Commonwealth v. Fisher, 364 Pa. 422, 430, 72 A. 2d 568." 102 A. 2d at 894.

Justice Bell continued with an exhaustive discussion of the earlier cases, especially *Commonwealth v. Fisher*, 364 Pa. 422, 424, 72 A. 2d 568 (1950) which was held to be controlling, and the contrary holding in *Rochez Bros., Inc. v. Duricka*, 374 Pa. 262, 97 A. 2d 825 (1953), which he distinguished on the ground that the land in *Rochez* "was agricultural and contain[ed] rich soil, ideally fit for farming." The later case of *New Charter Coal Company v. McKee*, 411 Pa. 307, 191 A. 2d 830 (1963), while approving the holding in *Fitzmartin,* was critical of the reason given for distinguishing *Rochez. Rochez* was decided, the *New Charter* court said, "simply on the grounds that the wording of the mining powers did not support an interpretation, other than that of giving the right to deep mine." After upholding Fitzmartin's right to strip mine the coal, Justice Bell said for his court:

> "Furthermore, there is another important clause in the mineral reservation in the instant case which prior decisions of this Court have held is sufficient to constitute an implied waiver of surface support. Here not only is *all* the coal reserved, together with the right to enter and mine, but the mining can be done *'without any liability whatsoever for damages to said lands,' viz., all the lands of the grantee, including, of course, the surface land."* 102 A. 2d at 897.

We have examined the cases cited by the State but we have not found in them anything that diminishes the validity of the

holding in *Fitzmartin*. There are, of course, cases which have denied the right to strip mine but in those cases the wording of the deeds and the attending circumstances are quite different from the language and the circumstances in *Fitzmartin* and in the case at bar.

It seems to us that the deed from the Company to McMillen is unclear only in respect of the absence of the words "strip mining." But, to repeat, neither are the words "deep mining" or "auger mining" included. Otherwise the language used is more strongly in favor of the owner of the coal than it is in any of the cases we have found or that have been brought to our attention. Absent other limiting words or circumstances, the right "to mine, excavate and remove" would seem ordinarily to be broad enough to include any method of recovering the coal. Perhaps we should observe that we are not unaware of what our predecessors said in *Piedmont Coal Co. v. Kearney*, 114 Md. 496, 503, 79 Atl. 1013 (1911) where the right of subjacent support was the main issue. Chief Judge Boyd, for the Court, said:

> "[I]t seems to us to be far better to require those who desire to enter into stipulations by which the one party to the transaction is to part with the right which the law gives him, and the other is to be relieved of a duty which the law imposes upon him, to use language that will necessarily import or clearly express such intention. It should be either by express words or necessary implication, and in our judgment the language used in this reservation was not sufficient to relieve the appellant of its duty to support the surface."

However desirable it may be for contracting parties, in the future, to be more specific, we think any reasonable appraisal of the circumstances, attending in 1931, makes it entirely clear that the Company and McMillen had no notion whatever of excluding strip mining as a method of removing the coal. In their scale of values the land had two assets, coal and timber, upon the removal of both of which, what remained would be

worthless. We find nothing admirable in their way of thinking but it has a significance here which cannot be overlooked.

## II.

Within two weeks after the filing of the bill of complaint the State filed a motion raising preliminary objections. Maryland Rule 323. Lack of jurisdiction and improper venue were alleged. Apparently the jurisdictional question has been abandoned since no mention of it was made in the briefs or at argument. The docket entries indicate a denial of the motion after a hearing on 5 January 1967. The chancellor gave no reasons for his action.

The State contends that neither the members of the Board of Public Works nor the director of the Department of Forests and Parks are residents of Garrett County nor do any of them carry on a regular business or habitually engage in a vocation or employment there. Code, Art. 75, § 75 (1965 Repl. Vol.). *Eck v. State Tax Commission,* 204 Md. 245, 103 A. 2d 850 (1954), where "person," as used in the statute, was held to include "public officials," is controlling, argues the State. Anticipating the Company's contention that this is a "local" action and, therefore, properly brought in Garrett County, the State deprecates the distinction between "local" and "transitory" actions and insists, in any case, that the action is not "local." "The real meat" of the action, the State argues, is that it seeks only the issuance of a permit.

That the distinction between local and transitory actions still exists seems to us to be beyond question. In his last opinion written for this Court, just before he resigned to become Solicitor General of the United States, Chief Judge Sobeloff, in *Superior Construction Co. v. Elmo,* 204 Md. 1, 102 A. 2d 739 (1954), said:

> "The distinction between local and transitory actions still exists in Maryland, and equally well settled is the rule that an injury to real estate is local and not transitory, as the cause of action could not have originated in any other place." (Citing cases.) *Id.* at 6.

Whether this is a local action is a question the resolution of which requires a consideration of the whole picture. The

record does not disclose why the Company sought the permission of the Board of Public Works. Neither statute nor regulation requiring such a step has been cited nor are we aware of any. To commence operations the Company had only to comply with the provisions of Code, Art. 66 C, §§ 659-674 (1967 Repl. Vol.), relating to registration, the filing of a bond, and the subsequent completion of certain reports. A permit from the Bureau of Mines was not required at the time. Cf. Code, Art. 66 C, §§ 657-674 (1967 Supp.). However, the bill alleges there were "antagonistic claims" between the parties indicating "imminent and inevitable litigation," and the State, in its answer, flatly denied the right of the Company "to remove its coal and other minerals by whatever means necessary, including strip mining." We think it can reasonably be inferred that the Department of Forests and Parks, having become aware of the Company's intention to strip mine its coal, served notice on the Company that any attempt to do so would be opposed. One can easily understand why the Company, in those minatory circumstances, would be reluctant to assume the risk and the expense of challenging the State by moving its equipment to the property, commencing operations and thereby provoking injunction proceedings or perhaps police action. Seeking the permission of the Board of Public Works offered an easier, cheaper and less harrowing way around the difficulty. There can be little doubt that, in the hearings before the Board and the Department, the State based its opposition on the contention, as put forth both in the court below and in this Court, that the Company's exception and reservation in the deed to McMillen did not permit strip mining. However viewed, it seems to us that the position taken by the State was as much an obstruction of the Company's rights in respect of the property as was the building of a fence across Pitcher's right of way in *Crook v. Pitcher*, 61 Md. 510, 513 (1884), (cited with approval in *Superior Construction Co. v. Elmo, supra*) where Judge Robinson, for the Court, said:

> "If the cause of action could only have arisen in a particular place, the action is local, and the suit must be brought in the county or place in which it arose. Ac-

140

tions for damages to real property, actions on the case for nuisances, or for the obstruction of one's right of way are according to all the authorities *local*."

In our judgment the State, by its attack before, during and after trial, on the Company's rights of record in respect of the property, has made this a local action. Perhaps also, it is not without significance that the State is the *owner* of the land and that Mr. Ellis, the director, "is in sole and active charge of the Department" to which is committed the promotion, administration and management of all forests and parks owned by the State. Code, Art. 66 C, §§ 343, 344 (1967 Repl. Vol.)

### III.

The State characterizes the chancellor's statement "that strip mining was a known and practiced method of removing coal in adjacent Allegany County in 1931" as "clear error." We do not agree and we shall not prolong this opinion by discussing it. The State's final complaint is aimed at the chancellor's denial of its petition for the introduction of additional evidence filed 3 months after this appeal was taken. We see no error here.

*Decree affirmed.*
*Costs to be paid by the State of Maryland.*