816 A.2d 854

CALVERT JOINT VENTURE # 140,

v.

Ross R. SNIDER et ux.

No. 52, Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 13, 2003.

20

Carlton M. Green (Green, Leitch & Steelman; Walter W. Green of Law Offices of Walter W. Green, on brief), College Park, for appellant.

John Marshall (Moldawer & Marshall, P.C., on brief), Rockville, for appellees.

Argued before BELL, C.J. ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

This case arises out of a November 1987 land installment contract and subsequent conveyance between petitioner, Calvert Joint Venture # 140,[1] and respondents, Ross and Nancy Snider. In the contract, respondents contracted to convey the subject property (tracts 1, 2 and 3) to petitioner for the stated purpose of building a residential subdivision while reserving an interest in all "oil, gas, or other mineral rights" in the property. No express easements over the surface of the parcel were reserved with the mineral rights. This litigation centers on petitioner's declaratory judgment action requesting a determination on respondents' ability to enter and use the surface of petitioner's property in the exercise of respondents' mineral rights pursuant to a deed emanating from a previous declaratory judgment action dealing with that land installment contract.

On November 23, 1987, petitioner contracted to purchase from respondents approximately 145 acres in Calvert County (the "Calvert Property") pursuant to a land installment contract. That contract included language that the Calvert Property was being purchased by petitioner to develop into a residential subdivision,[2] as well as a provision whereby respon-

---

**1.** While this joint venture may comprise several individuals, we shall refer to the Calvert Joint Venture # 140 and its representative at trial, in the singular, *i.e.*, it or petitioner.

**2.** Although the document did not specify that the contract was for the purpose of a *residential* subdivision, there is little or no doubt that the parties, at the time of execution of the Land Installment Contract in 1987 and certainly as of the resultant conveyance of Tracts 1 and 2 in 1996, appreciated that the subdivision contemplated by petitioner, a joint venture formed to develop and market real property, was a residential one. The parties stipulated in the Circuit Court proceeding leading to the instant case that the residential nature of the proposed

dents reserved the Calvert Property's mineral rights. In August 1995, a declaratory judgment action[3] was filed by petitioner in the Circuit Court for Calvert County, Maryland, alleging that respondents were unable to convey marketable title on tract 3, approximately 28 acres, of the Calvert Property. As a result of the declaration originating out of that action, a special warranty deed for tracts 1 and 2, the remaining approximately 115 acres of the Calvert Property, was delivered to petitioner on October 17, 1996, which included respondents' reservation of mineral rights but failed to include the clause contained in the land installment contract, out of which the declaratory action and deed arose, that had references to the residential development purpose of the original contract.[4] Respondents kept title to, and possession of, tract 3, which abutted on the Calvert Property. Petitioner's brief to the Court stated: "Appellees retained tract 3 that *adjoined* tracts 1 and 2" (emphasis added). Respondents do not contradict this statement of petitioners. Moreover, respondents adduced no evidence to the contrary, nor any that sought to quantify the effect of the abutment, adjacency or adjoinment.

It is not easy to discern from looking at the maps and plats in the record the extent of the respondents' ownership of lands adjacent to the lands at issue. At least some of that type of

---

subdivision was noted clearly on the earliest subdivision plan preparations in 1990. (Joint Stipulation of Facts, # 5). The subdivision application form notes the zoning of the property as "R–U–R," a rural residential zone under the Calvert County Zoning Ordinance. There is no indication that the subject property was rezoned after the contract was executed. Other than a bare denial in its Answer to the averments of paragraph 9 of petitioner's Complaint ("The intention of the parties under the November 22, 1987 contract was for the Plaintiff to subdivide the property it purchased for residential purposes ...."), respondents have not contended seriously at any other point in these proceedings that they did not understand that it was petitioner's intent to seek a residential subdivision of the subject property.

3. This declaratory judgment action is not at issue in the present case.

4. Hereafter, unless the context indicates otherwise, when referring to the Calvert Property we are referring to the land conveyed in this deed. It does not include "Tract 3" retained by respondents.

documentary evidence, standing alone, can certainly be construed as indicating minimal actual physical contact between the properties, *i.e.*, tracts 1, 2 and 3, as depicted on the plat attached to the 1987 contract. However, no issue was raised or evidence adduced by respondents that they did not retain land abutting the subject property through which subsurface access might be possible.

At the trial below, accessing the minerals from the adjoining property of the respondents was touched-on in cross-examination of a witness for the petitioners.

Respondents' counsel: "Why would you buy one [piece of property] that had mineral rights reserved?"

Petitioner: "Because it is not inconceivable that any oil and gas that they believe to be under the surface could be extracted without disturbing the surface."

Later petitioner's representative was asked:

Respondents' counsel: " . . . . What rights do you think they have?"

Petitioner: "They have the right to any income that would be produced by any oil or gas that was removed from underground."

Respondents' counsel: "So long as that came from—was siphoned off without touching your property."

Petitioner: "They have adjoining property."

Respondents' counsel: "That may be true and it may not be true, but so long as they don't come on your property, as long as they can somehow magically get these minerals from outside your property, they can get to it. Is that what you are saying?"

Petitioner: "Yes."

No evidence contrary to the testimony of this witness was presented by respondents. The evidence proffered by petitioner is the only evidence in the record as to accessibility from the adjoining property.

Additionally, in petitioner's opening argument to this Court, it stated:

"He [respondents] has an adjoining piece of property. He could drill a well, or whatever, to get down to gas, oil on his own property and he could take the substance out from under this property as long as he can do it without interference. That's a reasonable use of his rights."

Respondents, in their oral argument, as in their brief, never challenged petitioner's assertions that they owned an abutting parcel of property, and never, at the trial, in their brief to this Court, or in oral argument, posited that any minerals, *i.e.*, coal, gas or oil at issue could not be mined from that abutting property. During respondents' oral argument, there were additional acknowledgments that respondents retained abutting property. The following occurred:

Judge Harrell: "What are your client's rights with regard to that lot? Can you just come in there and—"

Respondent's Counsel: "—start tearing it up"

Judge Harrell: "—prospect with a test well?"

Respondent's Counsel: "I think the answer to that question is that we have a reasonable right to access the minerals."[5]

. . .

Respondent's Counsel: "I don't think ... my client can go in and raze the development."

. . .

Judge Cathell: "My understanding is when you reserve mineral rights you reserve the right to mine in from the side, but I could be wrong about that."

Respondent's Counsel: "I would respectfully disagree with that your Honor, but, if it were to be proven that was the least intrusive way to get at the minerals then that would be the most reasonable use."

---

**5.** Respondents never ascertained, before executing the 1987 contract or since, whether there are any minerals or oil and gas deposits beneath the surface of Tracts 1 and 2 and, if so, where they are located or whether they were in commercially feasible quantities or quality.

. . .

Judge Wilner: "[Do your clients own] abutting property?"

Respondent's Counsel: "Yes."

Judge Wilner: "So there is the possibility then of using that property to extract?"

Respondent's Counsel: "But, we can't speak to that possibility."

Judge Cathell: "Because if you owned the abutting property at the time you sold this property, then at that time you had the means available to extract subsurface minerals without going through the surface of the property you had sold away by diagonally drilling or by the way they do it in the coal fields. If later on you sell that adjacent property so that you remove the means . . . your client removes the means to mine without disturbing at all the surface of the property you sold. . . . It has some relevance."

. . .

Judge Cathell: "Is the adjacent piece of property [of respondents] for sale?"

Respondent's Counsel: "No. Not that I know of."

Accordingly, as do the parties, we accept that the tracts adjoin and underground access could be made from the property retained by respondents. We resolve the issues on that basis.[6]

Subsequently, petitioner requested that respondents sign and execute five plats on December 16, 1999, which subdivided the 115 acres of the Calvert Property conveyed to petitioners and other acreage obtained from a third party into 29 lots.

---

6. *The Oxford American College Dictionary* 14 (Putnam 2002), defines adjoin as "be next to and joined with (a building, room or piece of land.)" *The Random House Dictionary of the English Language, the Unabridged Edition* 18 (J. Stein ed., Random House, Inc.1983), defines adjoining: "being in contact at some point or line; bordering; contiguous. . . ." Adjacent is described as a synonym of adjoining. "Adjoining, adjacent, bordering all mean near or close to something." *Random House Webster's College Dictionary* 17 (Random House, Inc.1992), defines adjoining as "being in contact at some point or line; bordering; contiguous."

The plats also contained language that purported to restrict respondents' ownership interest in the Calvert Property's mineral rights to a life interest, limited respondents' access to the surface of the Calvert Property and subordinated respondents' mineral rights in the Calvert Property to the use of the surface as a residential subdivision.

After respondents declined to execute the plats because of the conditions contained on the plats, petitioner filed another Complaint for Declaratory Relief and Other Appropriate Relief in the Circuit Court for Montgomery County, Maryland [7] on March 24, 2000. It is this later action that forms the basis for this petition.

Petitioner's complaint included three counts. Count I requested the court to declare the extent to which respondents could use the surface of the Calvert Property it now owned in exercising their rights under the reservation of mineral rights in the deed, the effect of statutes on mining within a residential subdivision and the duration of the mineral rights reservation. In Count II, petitioner sought reformation of the October 1996 deed, while Count III requested specific performance requiring respondents to sign the five subdivision plats given to respondents in December of 1999.

Judge Paul J. McGuckian, for the Circuit Court for Montgomery County, Maryland, issued an Opinion and Order on April 24, 2001, which declared that the deed's reservation created two distinct interests in the Calvert Property, the surface owned by petitioner and the mineral rights owned by respondents. He additionally stated that these rights must be exercised with due respect as to the other party's interest. Judge McGuckian also declared that respondents own a fee simple interest in the minerals under the Calvert Property. Judge McGuckian did not speak to any "[i]ssues relating to the procedure, method, or timing of extraction of the disputed

---

7. Respondents, at the time of this subsequent action, resided in Montgomery County.

substances upon the surface estate," and declined to address the relief sought under Counts II and III.

Petitioner filed a Motion to Alter or Amend Judgment asking the court to order that respondents not disturb the surface of the land within the Calvert Property where petitioner has subdivided lots, planned roads, designated open space and other features of the intended living environment, and asking the trial court to order that respondents sign the five plats. The trial court denied this motion on June 11, 2001. Petitioner filed a timely appeal to the Court of Special Appeals on June 27, 2001.

On May 3, 2002, the Court of Special Appeals affirmed the trial court's order and specifically rejected petitioner's position on the issues of contract reformation and specific performance. *Calvert Joint Venture # 140 v. Snider,* 144 Md.App. 250, 797 A.2d 816 (2002). On June 13, 2002, petitioners filed a Petition for Writ of Certiorari with this Court. In that petition, petitioner presented the following three questions:

"A. Did the lower court and Court of Special Appeals fail to properly apply the doctrine of subjacent support as stated in *Piedmont and George's Creek Coal Co. v. Kearney,* 114 Md. 496, 79 A. 1013 (1911) in construing the respective rights of the parties under the reservation of mineral rights in the Land Installment Contract and Deed in this case?

"B. Under Maryland law, when the intended purpose of the acquisition of land is for subdivision into residential lots for resale and the seller agrees to cooperate in such subdivision process, and the seller fails to reserve in the mineral right reservation the right to utilize the surface for ingress / egress or for extraction of minerals, oil or gas, does the holder of mineral rights have the right to utilize the surface of the land intended to be used for a residential subdivision?

"C. Was the reservation of mineral rights / oil and gas rights in this case a fee simple or life estate reservation?"

On August 22, 2002, we granted the petition to answer these three questions. *Calvert Joint v. Snider*, 370 Md. 268, 805 A.2d 265 (2002).[8] In reference to petitioner's first question in its Petition for Certiorari, we hold that an owner of mineral rights owes a duty of support to the surface land. We, however, do not perceive that this issue is relevant in this case, except to the extent the "subjacent support" case law can be extrapolated to the issues actually present in the case *sub judice*. In regard to whether, pursuant to the October 1996 specialty warranty deed, respondents retain the rights of ingress and egress onto the surface of the Calvert Property,

---

**8.** In its brief to this Court, petitioner actually presented four questions:
"I. DID THE TRIAL COURT AND COURT OF SPECIAL APPEALS ERR IN FAILING TO DECLARE ALL THE RIGHTS OF THE PARTIES AS REQUESTED IN THIS DECLARATORY JUDGMENT ACTION AND IN FAILING TO PROHIBIT APPELLEES FROM USING THE SURFACE OF THE LAND IN THEIR EXERCISE OF THE MINERAL RIGHTS RESERVATION?
"II. DID THE TRIAL COURT AND COURT OF SPECIAL APPEALS ERR IN FAILING TO ADDRESS THE ISSUES PRESENTED IN COUNT II OF THE COMPLAINT IN WHICH APPELLANT SOUGHT REFORMATION OF THE SUBJECT DEED?
"III. DID THE TRIAL COURT AND COURT OF SPECIAL APPEALS ERR IN FAILING TO RULE ON APPELLANT'S COMPLAINT FOR SPECIFIC PERFORMANCE?
"IV. DID THE TRIAL COURT AND COURT OF SPECIAL APPEALS ERR IN HOLDING THE RESERVATION OF MINERAL RIGHTS EXTENDS TO APPELLEES' HEIRS?"
Only questions I and IV deal with issues comprised in the questions to which we granted *certiorari;* questions II and III are not properly before this Court. Respondents confine their answers to issues encompassed within petitioner's questions I and IV. As a result, while the Court of Special Appeals dealt with questions II and III of petitioner, we shall only directly resolve the issues for which we granted *certiorari* (questions A, B and C, *supra* ), issues which are partially contained within questions I and IV. *See Huger v. State*, 285 Md. 347, 354, 402 A.2d 880, 885 (1979) (citing Md. Rule 811(a)(3)(d) and holding that the question in petitioner's brief was not properly before the Court, because that same question was not included within the Writ of Certiorari granted by the Court). Our answer to the questions properly presented will, however, resolve the issues between the parties.

we hold that, under the circumstances of this case, respondents cannot use the surface of former Tracts 1 and 2 of the Calvert Property to prospect for or extract any subsurface minerals, oil or gas because of the combination of two factors: 1) any implied reservation as to access to the surface of the residential subdivision for mining would be an unreasonable way to access the minerals because respondents were well aware in 1987 when the land installment contract was executed of the fact that petitioner planned to use the property for a residential subdivision [9] and the utilization of the surface to conduct mining operations is incompatible with such residential uses; [10] and 2) an implied reservation to use the surface of the Calvert Property was, at the time of the conveyance, unnecessary under these facts as respondents' rights to extract the oil, gas or other minerals reserved in the deed could be accessed through respondents' adjacent property, tract 3, which was in possession of respondents at the time of the conveyance of tracts 1 and 2 to petitioner. Alternatively, respondents on this record failed to meet their burden of proof with regard to the elements of establishing an implied reservation. Finally, pursuant to well-established law, we hold that respondents' reservation of all oil, gas and other mineral rights in this case was a reservation of a perpetual interest.[11]

---

**9.** We note that appellees took no action to prospect or mine subsurface deposits in the 12 years before the final subdivision plats were submitted.

**10.** As defined by *The Oxford American College Dictionary* 1154 (Putnam 2002), "residential" means "designed for people to live in." As such, a residential subdivision, with its attendant open space and recreational areas, necessarily implies that such a subdivision is fit for people to live in it and, subject to a specific subdivision's requirements, an individual owner has a right to build not only a home, but patios, decks, swimming pools, gardens, stone paths, picket fences, statues, greenhouses, sheds, garages, basketball and tennis courts, putting greens, flower beds and the like. Any mining activities that would destroy or interfere with any of these types of residential uses or intended residential environment of the subdivision would be as improper as interfering with the home itself.

**11.** For guidance and flow purposes, we shall answer petitioner's questions in a slightly different order than in which they were presented to this Court in its Petition for Certiorari.

## I. Facts[12]

The record reflects that in 1982, respondents purchased a Calvert County, Maryland farm of approximately 145 acres and operated it as a tree farm prior to selling the property in 1987. On November 23, 1987, respondents entered into a land installment contract with petitioner for the sale of approximately 145 acres of the Calvert County farm. The sellers agreed that the petitioner could immediately begin to take all necessary action to create a residential subdivision on 106.248 acres of the parcel.[13] The relevant language of the land installment contract here, stated:

"During the life of this contract the Sellers agree on the 106.248 parcel only to sign applications required to plat and *record the property as a subdivision* in accord with and record same, provided that all expenses incurred therewith will be paid in whole by the Buyers. *Buyers may begin the subdivision process at anytime during the life of the land sales contract.*

"The Sellers reserve all oil, gas, and other mineral rights. Sellers also reserve in connection with the oil, gas or other mineral reservations the right to execute leases or other documents relating to production of oil, gas, and other

---

**12.** In the trial court, the parties submitted to a joint stipulation of facts. We include those facts along with some additional facts from the trial testimony and exhibits.

**13.** As previously mentioned, we shall refer to the land in question in the case *sub judice* as the "Calvert Property," which originally included 3 tracts. In the 1995 declaratory judgment action, the Calvert County Circuit Court found that respondents could not produce marketable title to tract 3, which consisted of approximately 28 acres, of the Calvert Property. Consequently, that court ordered respondents to execute a specialty warranty deed of tracts 1 and 2 (approximately 115 acres of the Calvert Property) to petitioner. Accordingly, all references to the property in question in this case, the Calvert Property after the 1996 deed, refers to only tracts 1 and 2, as tract 3 was severed by that October 17, 1996 specialty warranty deed. Whatever title respondents had in tract 3 apparently remains with respondents.

We note that the deed ultimately executed as a result of the trial court's judgment in the prior declaratory judgment action failed to include references to the intended use of the estate being granted.

minerals upon such terms and conditions as are acceptable to Sellers. (the Grantors)" [Emphasis added.]

There was no express reservation by the grantors/respondents of an easement in respect to access over or through the surface of the Calvert Property. Such a right, if it was intended to be reserved, could have, and under the circumstances of this case, should have, been included, but was not.[14]

Respondents agreed, in 1990, to sign papers necessary to begin the residential subdivision process, agreed "to cooperate in the subdivision process" for all of the acreage of the Calvert Property. However, during the process of dividing the Calvert Property for use as residential lots, a dispute arose between petitioner and respondents.

In August 1995, petitioner filed a complaint for declaratory judgment against respondents in the Circuit Court for Calvert County, alleging that respondents were unable to convey marketable title on tract 3, part of the approximately 145 acres described in the land installment contract of 1987. Petitioner sought a declaration as to the price of the remaining parcels, reformation of the contract and specific performance. Mineral rights issues were not litigated at this time. On February 12, 1996, the trial court set the sale price of the remaining land at $345,642.00 and ordered the land installment contract not to be otherwise modified. Pursuant to that court order, respondents executed a special warranty deed on tracts 1 and 2 to petitioner on October 17, 1996. The deed was properly recorded on May 30, 1997. The deed, in relevant part, stated:

"SUBJECT TO Grantor's reservation of all oil, gas or other mineral rights in and to the aforesaid property; Grantor also reserves in connection with the oil, gas or other mineral reservations, the right to execute leases or other documents relating to the production of oil, gas and other minerals

---

14. Most of the cases we have reviewed involved instruments in which an express easement was included.

upon such terms and conditions as are acceptable to Grantor."

Respondents apparently retained title to tract 3, which adjoins the lands conveyed by this deed, tracts 1 and 2. The special warranty deed made express references to the land installment contract, including: "WHEREAS, the parties hereto are the same parties to that certain land installment contract, dated November 22, 1987 . . . (called herein the 'contract'), and. . . ." It made no express mention of the provisions contained in the land installment contract, which related to the residential subdivision purpose of the sale.

In December of 1999, petitioner submitted a group of five final subdivision plats to respondents to sign. Respondents refused to sign the plats due to some of the language contained on them. The plats each included the following:

"WE, ROSS R. SNIDER AND NANCY J. SNIDER [respondents], OWNERS OF 'ALL OIL, GAS OR OTHER MINERAL RIGHTS IN AND TO THE AFORESAID PROPERTY' TOGETHER WITH 'THE RIGHT TO EXECUTE LEASES OR OTHER DOCUMENTS RELATING TO THE PRODUCTION OF OIL, GAS OR OTHER MINERALS, UPON SUCH TERMS AND CONDITIONS AS ARE ACCEPTABLE TO SELLERS' (ROSS R. SNIDER AND NANCY J. SNIDER [respondents] ), BY VIRTUE OF THE RESERVATION OF THE SAME CONTAINED IN THE DEED DATED OCTOBER 17, 1996 AND RECORDED MAY 30, 1997 IN . . . THE LAND RECORDS OF CALVERT COUNTY, MARYLAND, JOIN IN THIS PLAT FOR THE PURPOSES STATED ABOVE AND TO CONFIRM SAID OWNERSHIP IN THEMSELVES *FOR THEIR LIFETIME AND NO LONGER* AND TO CONFIRM THEIR RIGHT TO PROSPECT, MINE AND OPERATE IN AND UNDER THE LAND FOR OIL, GAS OR OTHER MINERALS, BY ANY AND ALL SUBTERRANEAN MINING METHODS THAT ARE PERMISSIBLE UNDER THE CURRENT COUNTY AND STATE REGULATIONS AND WILL NOT INTERFERE WITH THE USE OF THE SURFACE OF THE LAND AS A

RESIDENTIAL SUBDIVISION. ROSS R. SNIDER AND NANCY J. SNIDER [respondents] ACKNOWLEDGE THAT *SAID RIGHTS ARE SUBORDINATE TO THE USE OF THE PROPERTY AS A RESIDENTIAL SUBDIVISION AND THAT THEY RESERVED NO RIGHT OF INGRESS TO AND ON AND EGRESS FROM THE SURFACE OF THE LAND FOR THE PURPOSE OF PROSPECTING, MINING, DRILLING WELLS AND OPERATING BENEATH THE SURFACE AND EXTRACTING AND REMOVING OIL, GAS OR OTHER MINERALS FROM BELOW THE SURFACE OF THE LAND.* ROSS R. SNIDER AND NANCY J. SNIDER [respondents] ARE NOT RELEASED FROM ANY LIABILITY FOR DAMAGES OF ANY NATURE THAT MAY BE SUFFERED BY THE OWNERS OF THE SURFACE OF THE LAND OR ANY IMPROVEMENTS ON THE SURFACE NOW OR HEREAFTER ERECTED BY REASON OF DRILLING, BLASTING OR MINING OUT OR REMOVAL IN WHOLE OR IN PART OF ANY OIL, GAS OR OTHER MINERALS FROM UNDER THE SURFACE." [Alterations added.][Emphasis added.]

The parties stipulated below that respondents, as owners of the mineral rights to the Calvert Property, are not required by the law relating to recording plats, to sign the plats or participate in the recordation process in order for petitioner to record the plats in Calvert County. In fact, petitioner testified that it received its subdivision approval without respondents' signatures on the plats and that they have already been recorded in Calvert County.

As a result of the respondents' refusal to sign the plats which would subordinate respondents' rights to extract minerals, petitioner testified that its interest in the Calvert Property has been rendered unmarketable,[15] leading petitioner to file

---

15. Petitioner's representative testified that "[t]o have an unrestricted mineral right reservation, no one is going to purchase a lot for residential purposes if somebody can come in and sink an oil well in their

this second declaratory judgment action in the Circuit Court for Montgomery County, Maryland.

## II. Discussion

This appeal involves the relationship between the rights of the owners of property and the owners of any minerals lying beneath the same piece of land. The focus of the appeal leads this Court to an issue that we have yet to directly resolve: the implied reservation, if any, of an owner of subsurface mineral rights to enter and use the surface of the property to prospect for and/or gain access to those minerals.

We hold, that while, generally, such an implied easement by reservation may be found to exist, under the deed and circumstances in this case, where respondents reserved mineral rights without language allowing them ingress/egress access to the surface of the land, knowing the land was to be used as a residential subdivision, and at the time of the conveyance, respondents owned adjacent property from which they might exercise their right to any minerals under the Calvert Property, no easement, implied or otherwise, exists to use the surface of the Calvert Property to explore for or extract the minerals underneath said property.[16] In any event, respondents failed to meet their burden to establish the elements. necessary to support such an implied reservation. In addition, we shall discuss to some extent subjacent support. Finally, respondents' express reservation of mineral rights was sufficient to create a perpetual interest in the mineral rights underlying the subject tract.

---

backyard, or in their living room for that matter, so we were attempting to clarify that."

**16.** Because of the factual circumstances in which this case has reached the Court, we shall not address the converse situation, *i.e.,* where there is clear evidence that the grantee/owner of the whole estate knew at the time of the conveyance containing a reservation of mineral rights, that the reserver of those rights needed and/or intended to utilize surface access to explore for or extract minerals.

## A. Mineral Rights Reservation

This Court has very recently set out the standard for construing deeds in *County Commissioners of Charles County v. St. Charles Associates Limited Partnership*, 366 Md. 426, 463, 784 A.2d 545, 566–67 (2001), when we said:

> "The case law setting forth the general rules of construction of deeds affirms that, 'the court should take into consideration the language employed, the subject matter, and surrounding circumstances,' essentially the deed as a whole. *Weiprecht v. Gill*, 191 Md. 478, 484–85, 62 A.2d 253, 254–55 (1948); *see generally Neavitt v. Lightner*, 155 Md. 365, 142 A. 109 (1928); *Brown v. Reeder*, 108 Md. 653, 71 A. 417 (1908). Likewise, there is an equal abundance of Maryland case law directing the Court to strongly consider the intention of the parties." [Some citations omitted.]

Earlier, in *Chevy Chase Land Company v. United States*, 355 Md. 110, 123, 733 A.2d 1055, 1062 (1999), we said:

> "In construing a deed, we apply the principles of contract interpretation. *Buckler v. Davis Sand, Etc., Corp.*, 221 Md. 532, 537, 158 A.2d 319, 322 (1960). These principles require consideration of ' "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," ' *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d. 358, 363 (1999)(quoting *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985)). At least initially, the construction of a deed is a legal question for the court, and on appeal, it is subject to *de novo* review. *Calomiris*, 353 Md. at 433–35, 727 A.2d at 362–63. 'It is a cardinal rule in the construction of deeds that "the intention of the parties, to be ascertained from the whole contents of the instrument, must prevail unless it violates some principle of law." ' *D.C. Transit Systems v. S.R.C.*, 259 Md. 675, 686, 270 A.2d 793, 798–99 (1970) (D.C. Transit I) (quoting *Marden v. Leimbach*, 115 Md. 206, 210, 80 A. 958, 959 (1911)). Thus, we must consider the deed as a whole, viewing its language in light of the facts and circumstances

of the transaction at issue as well as the governing law at the time of conveyance."

In the case *sub judice*, the language pertaining to the reservation of mineral rights reserves the ownership of the mineral rights underlying the Calvert Property to respondents, but contains no specific language or reference to an express reservation of an easement of ingress/egress for respondents to enter on and penetrate the surface of petitioner's residential subdivision in order to access the minerals that may be in the subsurface of the property. The deed is silent as to the surface ingress/egress issue. It necessarily follows that in order for respondents to have access to the surface of the Calvert Property, they must have an implied reservation of such access or an implied easement of necessity to use the surface of that property to explore for and to extract any minerals below. We will separately outline the law in this State for the doctrines before we apply them to the circumstances of this case.

## 1. Implied Easement Doctrine

This Court has broadly defined an easement as a "nonpossessory interest in the real property of another." *Boucher v. Boyer,* 301 Md. 679, 688, 484 A.2d 630, 635 (1984) (citing *Condry v. Laurie,* 184 Md. 317, 320, 41 A.2d 66 (1945)). Easements may be created by express grant or by implication. *Shpak v. Oletsky,* 280 Md. 355, 360–61, 373 A.2d 1234 (1977). The *Boucher* Court said:

> "An implied easement is based on the presumed intention of the parties at the time of the grant or reservation as disclosed from the surrounding circumstances rather than on the language of the deed. [2 G. Thompson, *Commentaries on the Modern Law of Real Property* ] § 351, at 287 [(J. Grimes ed.1984)]. As a result, courts often refer to extraneous factors to ascertain the intention of the parties."

*Boucher,* 301 Md. at 688, 484 A.2d at 635 (alterations added). Necessity of an easement is one way in which an implied easement is created. *Hancock v. Henderson,* 236 Md. 98, 102, 202 A.2d 599, 601 (1964). Implied easements by necessity

arise from a presumption that the parties intended that the party needing the easement should have access over the land. *Greenwalt v. McCardell,* 178 Md. 132, 136, 12 A.2d 522, 524 (1940).

To better understand the law in respect to implied grants of easements, implied reservations of easements and ways of necessity, it may be helpful to track the treatment of such matters by the Maryland Courts since early in the Court's history, then continuing into more recent times.

One of the early cases in which we discussed the reservation of implied easements concerned the Charles Carrolls of Carrollton. *McTavish v. Carroll,* 7 Md. 352 (1855), involved a grant of land by Charles Carroll of Carrollton in 1832 adjacent to a dam and well retained by Carroll. Ultimately, it was held that Carroll's successor, also a Charles Carroll of Carrollton, had a right, *i.e.,* implied easement of necessity to use roads and other parts of the property his predecessor had conveyed, in order to clean out the mill race which fed or drained the mill pond retained. The millhouse, itself, apparently was part of the property the first Carroll had conveyed, *i.e.,* gifted.

There we noted: "But we think the privilege of using the dam, race and road, may be sustained upon the principle of legal necessity." *Id.* at 359. Later in *Carroll,* addressing the English case of *Spencer v. Spencer,* 2 Iredell's Law Rep. 95, also a case involving water rights, we quoted from *Spencer,* in respect to implied ways of necessity by reservation:

"so far as can be ascertained from the report, there was nothing to show, unless it be by inference only, that it was not merely convenient, but actually necessary, for the land owned by the defendant to be drained through those ditches .... If so, there was no such necessity before the court as would authorize them to have held, that the defendant was entitled, under an implied reservation, ... to use the ditches."

*Id.* at 361–62. We also mentioned in *Carroll,* another English case, *Burr v. Mills,* 21 Wend. 290 (1839). There, at the time the relevant deed of conveyance was executed, a dam had

already been erected that caused water to back up on part of an acre of the land conveyed to the grantee. The grantee's successor filed suit for damages as a result of the flooding. We noted in *Carroll* that the *Burr* court had held that even though the dam was in existence, and water covered the granted land at the time of the conveyance, there was no "implied reservation or exception in favor of the grantor." *Id.* at 362.

In concluding our discussion of the cases, we opined in *Carroll,* quoting *Angel on Water Courses, section 165:*

" 'A way of necessity to a water course would be, therefore, limited to the necessity which created it, and when such necessity ceases, the right of way will also cease.' In the following section the writer treats of the difference between what is necessary, and what is merely convenient, or desirable, and shows that the former is the ruling principle, and not the latter."

*Id.* at 367.

In *Mitchell v. Seipel,* 53 Md. 251 (1880), a grantor conveyed by absolute conveyance a portion of property that contained an alley and did not expressly reserve the right to use the alley in respect to the remainder of the parcel not conveyed. The land not conveyed could be accessed without the utilization of the alley. We first noted that: "While the unity of possession thus continued, it is very clear no easement in respect to this alley existed. A party cannot have an easement in his own land." *Id.* at 263. We then noted:

"But the question here is, whether upon such a grant, the law will engraft a *reservation of such easements* in favor of the part retained by the grantor. . . . It has often been cited . . . [that] the doctrine of implied reservation stands upon exactly the same footing as the doctrine of implied grant, but in so far as it may be thought to sustain that position, we have high authority of THESIGER, L.J., who delivered the judgment of the Court of Appeals in *Wheeldon v. Burrows,* 12 Ch. Div. 31, for the statement that it has again and again been overruled. . . .

. . .

"... In an able and extended opinion delivered by THE-SIGER, L.J., all the leading English decisions are reviewed, and as a result of this review two propositions are stated: *First*, that all these continuous or apparent easements, or in other words all these easements are necessary to the reasonable enjoyment of the premises granted, and which have been and are at the time of the grant used by the owner of the entirety for the benefit of the part granted, *will pass to the grantee under the grant.* *Second*, that if the grantor intends to reserve any right over the tenement granted it is his duty to *reserve it expressly* in the grant, and to this the only exception is of *ways or easements of necessity.* Both these general rules are founded upon the maxim that 'a grantor shall not *derogate* from his grant....' By these recent decisions the doctrine of *implied reservation* in such cases of all such easements as are mentioned in the first proposition, is utterly repudiated....

"Such is the present state of English authority upon this question, and the law in that country seems at last to be placed upon a reasonable and solid foundation....

. . .

"Finding then no binding decision of this Court ... to prevent us from following the law ... [of] the decisions in England ... we shall apply it to the case before us.

"It remains then to ascertain whether this alley is a way of necessity, so as to fall within the exception to the second proposition [above].... 'It appears at the time of the grant in respect of which the right of way is claimed, there was a way from the house into the garden, and that way now exists. But it is said that the way now claimed is more convenient than the other. Then comes the question whether the plaintiff can claim it as a way of necessity.... There is no foundation whatever for such a doctrine.' Whether it is a way of necessity or not, must depend upon the state of things existing at the date of the deed in 1865, and not with

reference to the changes subsequently made by the plaintiff on his own premises."

*Id.* at 264–75 (some citations omitted) (alterations added).

We reiterated in *Burns v. Gallagher,* 62 Md. 462, 471–72 (1884), a case concerning access to an outdoor privy, that:

> "For the principle is well settled, and it is founded in reason and good sense, that no easement or *quasi* easement can be taken as reserved by implication, unless it be *de facto* annexed and in use at the time of the grant, and it be shown moreover to be *actually necessary* to the enjoyment of the estate or parcel retained by the grantor. And such necessity cannot be deemed to exist if a similar way or easement may be secured by reasonable trouble and expanse, and especially if the necessary way or easement can be provided through the grantor's own property.... It is only in cases of the strictest necessity, and where it would not be reasonable to suppose that the parties intended the contrary, that the principle of *implied* reservation can be invoked." [Citations omitted.] [Emphasis in original.]

We have also explained the difference between an exception and a reservation created by conveyances.[17] In *Herbert v. Pue,* 72 Md. 307, 310, 20 A. 182, 183 (1890), the

---

**17.** The "property of another" in the case *sub judice* is the fee simple estate of petitioners in the whole property, subject to the reservation of mineral rights. The language used in the documents, in effect, was the grant of the whole estate. The documents did not grant the property "except" for the subsurface. In the law of conveyancing, "exceptions," generally, relate to a physical part of property being "excepted" from the grant. *See Carroll v. Granite Mfg. Co.,* 11 Md. 399, 408–11 (1857). A "reservation" generally relates to a right reserved to the grantor permitting the grantor to exercise some act upon the property conveyed. Over time the terms have often been used interchangeably—but technically they are different. The language used in this deed, with which we are concerned, creates a reservation, a right, but does not "except" subsurface property from the grant. Accordingly, the entire property is conveyed, subject to the right retained by the grantor to extract minerals. The deed did except tract 3 from the conveyance: "the said Grantor, does hereby grant ... BEING Tracts # 1 and # 2 of Exhibit A of the [Land Installment] Contract, being also, all of farm.... *Excepting* therefrom ... 'Tract 3.'" (alterations added) (emphasis added).

language in the conveyance immediately after the grant stated: "Reserving . . . for all the descendants of the said Arthur Pue, the use of . . . a graveyard." The language did not "except" the area of the graveyard from the grant. We then noted, quoting from Lord Coke in his *Commentaries upon Littleton*, 47a: " 'a diversity between an exception [in a conveyance] (which is ever part of the thing granted, and of a thing *en esse* ), and a reservation, which is always of a thing not *en esse*, but newly created or reserved out of the land or tenement demised.' " *Id.* at 311, 20 A. 182, 183 (alteration added). *See also Lippincott v. Harvey,* 72 Md. 572, 578–80, 19 A. 1041, 1043 (1890) (an early case involving the sale of property to developers who planned to create a subdivision).

In *Lippincott,* the grantor argued that he was possessed of an implied reservation to use the granted property for a certain right of way indicated by a reference to "Sutton avenue" on the plat to which reference was made in the grant. We stated, referring to the grantee where the grantor sought to bind the grantee:

"to a servitude which he resists, and insists that he never bought subject to. It is a burdensome and very prejudicial servitude; and, to fasten it on the appellee's land in favor of the vendors, there should be clearer proof of its unequivocal reservation than we can find in this case.

"The rule is laid down in numerous authorities that, where the servitude is a burdensome one, only strict necessity will raise the implication of its reservation. 'Great convenience is not enough.' 2 *Wait's Actions and Defences,* 668–9–70, and authorities there cited. *Mitchell vs. Seipel,* 53 Md. 251. It would be very convenient, beyond a doubt, for the appellants to have a perpetual right of way and outlet in what is called 'Sutton avenue' on the plat; but it is manifestly not a way of necessity. . . . [T]o grant the prayer of [appellant's] of their bill would inflict great and lasting injury upon the appellee and bind him to a condition and situation as respects to his lots which he did not contemplate when he purchased. . . . [T]he appellee [grantee] holds

the lots he purchased discharged of the claim which the appellants [grantors] have set up."

*Id.* at 579–80, 19 A. at 1043 (alterations added). *See also, Eliason v. Grove,* 85 Md. 215, 225, 36 A. 844–45 (1897); *Tong v. Feldman,* 152 Md. 398, 402, 136 A. 822–23 (1927) ("The necessity must be imperative and absolute. 'It is only in cases of the strictest necessity, and where it would not be reasonable to suppose that the parties intended the contrary, that the principle of implied reservation can be invoked.' ") (quoting *Burns v. Gallagher, supra* ); *Hansel v. Collins,* 180 Md. 209, 216, 23 A.2d 686, 690 (1942); *Slear v. Jankiewicz,* 189 Md. 18, 23–24, 54 A.2d 137, 139–40 (1947); *Dalton v. Real Estate & Imp'v't Co.,* 201 Md. 34, 47, 92 A.2d 585, 591 (1952) ("However, if a grantor intends to reserve any rights or uses in or over the tenement granted, he must reserve them expressly, and the only exception is of easements, including ways, of actual, strict necessity. The reason for the last rule is said to be that a grantor cannot derogate from his grant."); *Mitchell v. Houstle,* 217 Md. 259, 264, 142 A.2d 556, 558 (1958) ("From a very early date, a distinction has been made between an implied grant and an implied reservation, with the rule being much more strict when called upon to create an easement by implied reservation than to create one by implied grant.").

This Court set out the law of implied easements more recently and more completely in *Shpak,* 280 Md. at 361, 373 A.2d at 1238, when, citing to some of the cases above, we stated:

" 'Ways by necessity are a special class of implied grants and have been recognized in this State for a good many years.' [quoting *Henderson,* 236 Md. at 102, 202 A.2d at 601.] There are two types of ways of necessity, implied reservation and implied grant. If a reservation is not expressly made 'in the deed, it must be shown that there is a necessity for its use by the property retained over the property conveyed.' *Hansel v. Collins,* 180 Md. 209, 216, 23 A.2d 686 (1942). To similar effect relative to necessity, sometimes referred to as necessary to be 'imperative and absolute,' *see Condry v. Laurie,* 184 Md. 317, 322, 41 A.2d

66 (1945); *Tong v. Feldman,* 152 Md. 398, 402, 136 A. 822 (1927); *Jay v. Michael, supra,* 92 Md. at 210, 48 A. 61; *Burns v. Gallagher,* 62 Md. 462, 472 (1884); and 2 G. Thompson, *Commentaries on the Modern Law of Real Property* § 353 (J. Grimes ed. 1961).... *An easement by implied reservation must arise at a time when there is unity of title.* *Hansel v. Collins, supra,* 180 Md. at 216, 23 A.2d 686....

" '[G]rants of easements by implication are looked upon with jealousy and are construed with strictness by the courts.' *Condry v. Laurie, supra,* 184 Md. at 321, 41 A.2d 66. *'The rule with respect to implied reservations is much more strict than that with respect to implied grants.'* *Slear v. Jankiewicz, supra,* 189 Md. at 22, 54 A.2d 137, quoting *Hansel v. Collins, supra,* 180 Md. at 215, 23 A.2d 686." [Some Citations omitted.][Some alterations added.][Emphasis added.]

▮▮▮▮ In the case of *Hansel v. Collins, supra,* this Court found that there was no necessity of circumstances for an implied easement to be created. We said:

" 'For the principle is well settled, and it is founded in reason and good sense, that no easement or *quasi* easement can be taken as reserved by implication, unless it be *de facto* annexed and in use at the time of the grant, and it be shown moreover to be *actually necessary to the enjoyment of the estate or parcel retained by the grantor. And such necessity cannot be deemed to exist if a similar way or easement may be secured by reasonable trouble and expense, and especially not if the necessary way or easement can be provided through the grantor's own property.* In order to give rise to the presumption of a reservation of an existing easement or *quasi* easement, where the deed is silent upon the subject, the necessity must be of such strict nature as to leave no room for doubt of the intention of the parties that the adjoining properties should continue to be used and enjoyed.... If the grantor intends to reserve *any right* or easement over the property granted, it should be done by express terms.... *It is only*

*in cases of the strictest necessity, and where it would not be reasonable to suppose that the parties intended the contrary, that the principle of implied reservation can be invoked.'* " [quoting *Burns v. Gallagher,* 62 Md. 462, 471–72 (1884)] . . .

"*It will be observed that the reservation must be made at a time when there is unity of title, and if not expressly reserved in the deed, it must be shown that there is a necessity for its use by the property retained over the property conveyed.* Several of these factors are missing in the present instance. . . . The property retained . . . was not dependant upon appellants' property . . . for its water. There was no question of necessity, and it cannot be presumed under the circumstances that, having given an absolute deed, the grantors intended to reserve any rights over the property granted."

*Hansel,* at 215–16, 23 A.2d at 689–90 (alteration added) (emphasis added). *See also Beck v. Mangels,* 100 Md.App. 144, 158, 640 A.2d 236, 243 (1994); *Markey v. Wolf,* 92 Md.App. 137, 158, 607 A.2d 82, 93 (1992) (involving the reservation of the right to alter covenants).

### 2. Mineral Rights Doctrine

Before we apply the doctrine of implied easements to the case at bar, we shall discuss this State's law with respect to the relationship, generally, between the owners of mineral rights and the owners of the property subject to a severance of mineral rights, and thus explain the interplay of the doctrine of mineral rights law with that of the doctrine of implied easements by reservation. Because this Court has never specifically addressed many of the issues stemming from the separation of the mineral rights from an estate, we also look to the law from our sister states, as well as our own case law regarding subjacent support rights, in ascertaining the ultimate state of mineral rights law in Maryland. In essence, we hold that the type of conveyance utilized here gave the right to extract the subsurface minerals to respondents and gave to petitioners the title to the entire property,

subject, however, to the rights of respondent to extract sub-surface minerals from the property. Two separate, coexisting interests are created in the property. In addition, we agree with a majority of our sister states' courts in holding that, where warranted by the circumstances, a reservation of sub-surface mineral rights *may,* under appropriate circumstances, carry with it an implied easement to utilize the surface, where, at the time of the conveyance, a necessity for such an ease-ment under the circumstances of a particular case exists to utilize such surface of the property to access those minerals and where, at the time of the conveyance, such a reservation of an implied easement would not be in conflict with the known intended future uses of the whole property being conveyed. Lastly, while we reaffirm our long-held doctrine of subjacent support, we do not agree with petitioner's conten-tion that it is determinative in the case at bar.

We first discussed the rights of mineral owners nearly 100 years ago in the case of *Piedmont and George's Creek Coal Company v. Kearney,* 114 Md. 496, 79 A. 1013 (1911). In that case we opined:

"The general rule of law is that when the estate in minerals 'in place,' as they are sometimes spoken of in their natural bed, is severed from the estate in the surface, the owner of the latter has an undoubted right of subjacent support for the surface, and the owner of the estate in the minerals is entitled to remove only so much of them as he can take without injury to the surface, unless otherwise authorized by contract or statute."

*Id.* at 501, 79 A. at 1015. While not affirmatively articulating it as a rule of law, this Court's use of language of "severed from the estate," as opposed to "excepting" from the grant, in reference to the minerals rights in that case recognizes that a reservation of mineral rights by a grantor creates two inde-pendent, distinct and co-existing interests in one parcel of land; one in the whole property subject to a reservation of mineral rights and one in the minerals beneath the surface of the land.[18] The former is often described as the surface

---

18. It is possible that other interests can be severed as well, *i.e.,* "air rights." Additionally, a modern trend in title law has begun to recog-

estate, although it is in reality the whole estate "subject to" the mineral rights. The latter is often referred to as the subsurface estate, although, as to the subsurface, it is only a limited right when reservation, as opposed to "exception" language, such as that contained in the present deed is used.[19]

The separation of "estates" (or more accurate, "interests") in this manner is recognized in other jurisdictions, including the Arizona case law which the Court of Special Appeals relied on in rendering its decision in this case.[20] *See,*

---

nize such things as "development rights," and other non-traditional forms of ownership.

**19.** There may be elements beneath the surface of land that do not constitute minerals under mineral rights laws, *i.e.,* subterranean water, subterranean air (caverns and caves), animal life, etc. For this additional reason, we doubt that a "reservation" of "mineral rights" alone carries with it an estate in the entire subsurface of property. Accordingly, when language such as that used in the present case establishes the rights of parties, it is more proper to note that there is but one estate, subject to certain specific reservations. However, many of the mineral rights cases generally refer to mineral rights as estates. Accordingly, when such a term as an "estate" in the subsurface is used, it generally refers to a limited (mineral right) right in the subsurface. Accordingly, the terms "surface estate" and "subsurface estate" may not be, in the cases, completely accurate unless the conveyances "except" from the grant all of the subsurface of a property. However, we shall in this opinion, sometimes, refer to the interests in reserved minerals as "estates" in order to be consistent with the language of many of the cases.

**20.** The Court of Special Appeals relied on *Spurlock v. Sante Fe Pacific R.R. Co.,* 143 Ariz. 469, 694 P.2d 299 (1984), in its opinion in this case. While *Spurlock* is valid for many of the propositions for which it was relied on by our lower court, it is not, contrary to the contention of the lower court, determinative on the question of whether respondents have a right to use the surface of petitioner's residential subdivision. In fact, the *Spurlock* court specifically passed on answering a question such as the primary one in the case at bar when it said:

"In the present case, only the issue of ownership rights under the general mineral reservation is before us. Issues relating to the effect of extraction of the disputed substances upon the surface estate have not been briefed or argued before this court. Nor do the judgments below purport to rule on these matters. Accordingly, we do not believe it appropriate for this court to speculate as to whether or not production of any minerals would substantially interfere with the surface estate."

*Spurlock v. Sante Fe Pacific R.R. Co.*, 143 Ariz. 469, 478–79, 694 P.2d 299, 308–09 (1984); *see also Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 50–55, 103 S.Ct. 2218, 2226–29, 76 L.Ed.2d 400, 411–15 (1983); *Gill v. Colton*, 12 F.2d 531 (4th Cir.1926); *Maynard v. McHenry*, 271 Ky. 642, 113 S.W.2d 13, (1938); and *Youghiogheny River Coal Co. v. Allegheny Nat'l Bank*, 211 Pa. 319, 60 A. 924 (1905). In *Spurlock*, the Arizona Supreme Court stated:

> "[W]e believe a reservation of 'all minerals whatsoever' reflects a *general* intent of the parties to sever the surface estate from the underlying mineral estate. *Maynard v. McHenry*, 271 Ky. 642, 113 S.W.2d 13 (1938). It indicates that the parties intended to create two distinct, coexisting, and individually valuable estates. Thus, the grantor retains ownership of all commercially valuable substances separate from the soil, while the grantee assumes ownership of a surface that has value in its use and enjoyment."

*Spurlock*, 143 Ariz. at 478, 694 P.2d at 308 (alteration added). As can be seen in *Spurlock*, the grantor "excepted" mineral rights from the conveyance. Respondents in the case *sub judice*, reserved "all oil, gas or other mineral rights in and to the aforesaid property." As such, we hold that this reservation created an ownership interest in the minerals in respon-

---

*Id.* at 480–81, 694 P.2d at 310–11 (footnote omitted). In addition, the deed in *Spurlock*, is entirely distinguishable from the one in the case *sub judice* as it "excepted" the minerals from the conveyance, as well as expressly reserving broad rights to access and use the surface for the benefit of the mineral estate "excepted." The express language stated:

> " 'Grantor expressly reserves and excepts all oil, gas, coal and minerals whatsoever, already found or which may hereafter be found, upon or under said lands, with the right to prospect for, mine and remove the same, *and to use so much of the surface of said lands as shall be necessary and convenient for shafts, wells, tanks, pipe lines, rights of way, railroad tracks, storage purposes, and other and different structures and purposes necessary and convenient for the digging, drilling and working of any mines or wells which may be operated on said lands.' "*

*Id.* at 474 n. 2, 694 P.2d at 304 n. 2. (emphasis added). Thus, the *Spurlock* court's own language, coupled with the express language of the deed in that case, makes it inapplicable to the ultimate issues of the case at bar. The Court of Special Appeals' reliance on *Spurlock* as being determinative in this case, was, although informative, misplaced.

dents, separate and apart from the whole "estate" in the property at issue which belongs to petitioners.[21]

Generally, while this State has yet to speak to the issue, once the mineral rights have been reserved (or granted) and the whole estate has been encumbered by the instrument of conveyance, some other states have found that the reservation, conveyance or leasing of mineral rights includes an implied easement for the owner of those rights to ingress, egress, occupy and use the surface of land, as reasonably necessary, for the purpose of extracting those minerals in the absence of specific language granting those rights.[22] *See generally, Norken Corp. v. McGahan*, 823 P.2d 622, 628, 628 n. 6 (Alaska 1991) (not applying the "universal recognition" of an owner of mineral rights to use the surface to obtain said minerals where alternate access to the land was not at issue and when the substance concerned is neither a mineral, nor was a substance intended to be removed in the lease); *Spurlock*, 143 Ariz. at 479, 694 P.2d at 309 (stating, in a case concerning a deed with a comprehensive mining reservation, including the right to enter, mine and use the surface, that it is logical that a surface owner would agree to a reasonable burden or some surface destruction on his estate by the mineral rights owners in order for the latter to access his estate); *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 927 (Colo.1997) (stating, in a case concerning an oil lessee's excessive and unreasonable use of the surface where the lessee had no other access and in

---

**21.** As we have noted, such language really creates a right to own and extract minerals, as opposed to a creation of separate "estates." However we recognize that use of the term "estates" in such circumstances has often been the term of choice.

**22.** The law of mineral rights is vast and complex. We do not purport to cite every case, in every jurisdiction, speaking to mineral rights law relevant to this case; we merely cite to some of the more recent cases dealing with these issues. For a more thorough discussion in the cases of mineral rights law where the minerals rights are granted or reserved separate from the superjacent land, *see* 58 C.J.S. *Mines and Minerals* §§ 158–90 (1998); or its predecessor, 58 C.J.S. *Mines and Minerals* §§ 150–60 (1948). *See generally* 54 Am. Jr.2d *Mines and Minerals* §§ 102–148.

reference to access to the superjacent surface, "the right of access to the mineral estate is in the nature of an implied easement, since it entitles the holder to a limited right to use the land in order to reach and extract the minerals"); *Crawford v. Hrabe*, 44 P.3d 442, 447 (Kan.2002) (which involved an oil lease that expressly granted use of the surface property, the court noted the proposition that, while not determinative in that case, an owner or lessor of mineral rights had an implied right to make a reasonable use of the surface); *Bonner v. Oklahoma Rock Corp.*, 863 P.2d 1176, 1183 n. 32 (Okla.1993) (noting although not at issue in that case, that for mineral rights owners, "the right of ingress and egress for development is now implied in both grants and reservations"); *Melton v. Sneed*, 188 Okla. 388, 109 P.2d 509 (1940) (although the facts are not clear as to alternate access and the necessity to enter and use the surface property, stating that the right of entry accompanies a grant of mineral rights); *Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865, 867 (Tex.1973) (stating an ownership in mineral rights "carries with it the right to use the surface, including water, to the extent reasonably necessary to develop and produce the minerals" in a case awarding damages to the surface owner for the mineral rights owner's unreasonable use of the surface where there was no proof of the necessity of that use); *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 625–26 (Utah 1989) (recognizing that a mineral owner has an implied easement of ingress/egress over the surface of the land if "reasonably necessary" in a case where the mineral rights owner contracted for broad surface rights in order to facilitate exploration and production of the minerals); *Flying Diamond Corp. v. Rust*, 551 P.2d 509, 511, 511 n. 1 (Utah 1976) (approving of, and citing to treatises on the general rule "approved by all jurisdictions that have considered the matter ... that the ownership (or rights of a lessee) of mineral rights in land is dominant over the rights of the owner of the fee to the extent reasonably necessary to extract the minerals therefrom" in a case where, pursuant to a broad oil and gas lease, the surface owner received damages for the lessee's placement of an

access road that interfered with his crops when the road could have been placed elsewhere on the land. The court found that it wasn't necessary to build the road where it was built.); *Phillips v. Fox*, 193 W.Va. 657, 662–63, 458 S.E.2d 327, 332–33 (1995) (reiterating the well-settled West Virginia law that "ownership of a mineral estate includes the right to enter upon and use the superjacent surface by such manner and means as is fairly reasonable and necessary to reach and remove the minerals" in a case concerning a deed silent as to surface use issues and whether strip mining was allowable. The court remanded to ascertain the necessity of this type of mining.); Howard R. Williams & Charles J. Meyers, Oil and Gas Law 218 (1996) (stating that when provisions such as ingress/egress are absent from the instrument conveying the mineral right, courts have held that such surface easements are implied and then they will permit the lessee or mineral owner to enjoy their interest).

 A right to underground minerals might be valueless without the right to access the minerals. However, the creation of an implied easement is affected by other factors; an implied easement exists only if, at the time of the separation of the mineral rights there exists an actual necessity for the owner of said rights to enter the surface lands above those minerals in order to derive value from or make use of the interests in the minerals. This Court has consistently said: " 'It is only in cases of the strictest necessity, and where it would not be reasonable to suppose that the parties intended the contrary, that the principle of implied reservation can be invoked.' " *Hansel v. Collins*, 180 Md. at 216, 23 A.2d at 690 (quoting *Burns v. Gallagher*, 62 Md. 462, 471–72). We hold that, generally, when the ownership of minerals is severed by exception, reservation or grant, the mineral rights owner may retain an implied easement to access the surface of the superjacent surface lands only when there is a strict necessity for such an easement and it does not conflict with the known intended use of the whole property at the time of the conveyance and/or severance. This is especially so when the right to the minerals is created by a reservation in a conveyance by a

grantor of the whole estate. This implied easement by reservation, moreover, is far from absolute. We also hold consistent with our sister courts, that the use must be reasonable and not in conflict with the intent of the parties as of the time of the conveyance.

As previously noted, our sister states mainly focus on whether the specific use of the surface in question is reasonably necessary for the extraction of the minerals. While the implied easement to reasonably use the surface of the land to access its underlying minerals is generally accepted, when making a determination of the scope of the implied right, courts have looked into ascertaining the intent of the parties through an analysis of the circumstances surrounding each case, including, but not limited to, the language in the deed, the purpose for which the land conveyed was to be used, the purpose for which the right was reserved, the actual necessity for the implied easement and the knowledge of the parties. *See Department of Forests and Parks v. George's Creek Coal & Land Company*, 250 Md. 125, 242 A.2d 165 (1968) (holding that extrinsic evidence revealed the parties' intent to include strip mining as an accepted method when the deed was ambiguous as to whether grantor's reservation included strip mining); *see also Bibby v. Bunch*, 176 Ala. 585, 58 So. 916 (1912) (holding, that where no stipulation of mining methods exists and where the surface lands have been shown to contain plentiful timber, grasses and herbs which make that land valuable for agriculture or residential development that would be severely adversely affected by mining operations, courts should first consider the surface interests "from which the human family draws sustenance and on which it lives and moves, and declare, in the absence of special covenant to a contrary effect, the absolute right to its use and enjoyment, subject only to those rights in the owner of the underlying minerals which are necessarily implied"); *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974) (construing the intent of the parties to a deed not to include strip mining of a surface because of the total incompatibility of strip mining with enjoyment of the surface and that there is a

heavy burden on the party seeking to demonstrate the right to mine in that fashion); *Rochez Bros., Inc. v. Duricka,* 374 Pa. 262, 97 A.2d 825 (1953) (focusing on the nature and character of the land as a farm in disallowing strip mining operations); *Friedline v. Hoffman,* 271 Pa. 530, 115 A. 845 (1922) (holding that, as defendants had "a practicable way over their own lands for the removal of the coal in question; hence the law cannot allow them a right-of-way by necessity over plaintiff's land" where defendants purchased five acres of the land in which they had mineral rights for the purpose of creating an opening into the surface to extract coal); *Getty Oil Co. v. Jones,* 470 S.W.2d 618 (Tex.1971) (establishing the accommodation doctrine in Texas, whereby if it is shown that a mineral owner has reasonable alternative ways to extract minerals which will not interfere with the surface owner's intended use, the mineral owner must choose the use not precluding the use of the surface owner).[23]

In *George's Creek Coal & Land Co.,* this Court construed a deed excepting and reserving broad mining rights to include strip mining methods although strip mining would destroy the surface above the coal, which was rocky, unimproved and covered with timber at the time of the reservation. In doing so, this Court relied on the intent of the parties at time of the conveyance. At that time, George's Creek Coal and Land Company[24] conveyed land known as "Beattys' Plains" to McMillen, who was in the timber and pulping business.[25] George's Creek excepted and reserved the following in the deed in that case, " '*Excepting, however, from the operation of this deed, and reserving* ... *all the coal, clay and other minerals, and all the oil and gas underlying said land hereby conveyed,* together with the right *to enter in, upon and under said land and to mine, excavate* and remove all said coal, clay

---

23. *See also* cases cited *supra.*

24. Hereinafter, "George's Creek."

25. It was known to the grantees that "George's Creek" was a mining company that utilized strip mining procedures.

and other minerals, and said oil and gas....' " *George's Creek Coal & Land Co.*, 250 Md. at 127, 242 A.2d at 166. *As is evident, there was an express reservation of an access easement.* The express reservation then went on to list several other easements reserved in the property, such as the right to transport minerals, construct buildings, roads, tunnels and other structures, and relieving the grantor of liability for " 'the breaking or subsidence of the surface.' " *Id.* In considering whether this type of deed allowed strip mining, this Court focused on this broad exception and express reservation language coupled with the parties' intent, when we said:

> "However desirable it may be for contracting parties, in the future, to be more specific, we think any reasonable appraisal of the circumstances ... makes it entirely clear that the [George's Creek Coal and Land] Company and McMillen had no notion whatever of excluding strip mining as a method of removing the coal. In their scale of values the land had two assets, coal and timber, upon the removal of both of which, what remained would be worthless. We find nothing admirable in their way of thinking but it has a significance here which cannot be overlooked. "

*Id.* at 137–38, 242 A.2d at 172 (alteration added).[26]

In the present case, as we have noted, the grantor failed to reserve express access easements such as those existing in *George's Creek Coal & Land Co. If respondents, who owned land adjacent to the Calvert Property, had deemed such surface access necessary it would have been easy for them to have included such rights in the land contract and subsequently expressly reserved them in the deed.*

The reasonableness of the mineral rights owner's use of the land often depends on the character or planned use of that

---

**26.** As the deed in *George's Creek* "excepted" and "reserved" from the conveyance, it can be properly said that the grantor retained an "estate" as well as an interest in the minerals "excepted" from the conveyance. It would appear to be the better practice to both "except" minerals from conveyances and "reserve" the right to mine, *i.e.*, extract them.

land. In *Rochez Bros., Inc. v. Duricka,* 374 Pa. at 265–66, 97 A.2d at 826, the Supreme Court of Pennsylvania, in its disallowance of strip mining operations pursuant to the deed conveying extremely broad mining rights in that case, said:

> "It is obvious, in view of the surface violence, destruction and disfiguration which inevitably attend strip or open mining, that no land owner would lightly or casually grant strip mining rights, nor would any purchaser of land treat lightly any reservation of mining rights which would permit the grantor or his assignee to come upon his land and turn it into a battleground with strip mining."

After analyzing the leading Pennsylvania cases in this area, the court went on to say:

> "The surface of the ground involved here is farm land. A farm, except in a very restricted way, is not affected by underground mining. The farmer may plough, plant and prune while miners work underneath his growing crops. But strip mining drives him from his fields as effectively as a tornado. And the damage done is not restricted to the year in which the mining occurs.... [T]he top soil is so wounded and scarred by rock, shale, gravel and unusable coal that it is rendered incapable of production for many years. No farmer would permit such a disablement of his land without specific consideration. It is clear in this case that the rights reserved and later conveyed to the plaintiff were not broad enough to include such disablement."

*Id.* at 269, 97 A.2d at 827–28.

In *Friedline v. Hoffman,* 271 Pa. 530, 115 A. 845, before buying all of the mineral rights in a larger tract of property, the buyer also purchased outright five acres of the superjacent land for the purpose of using its surface for coal mining operations to extract the minerals. The buyer then discovered that it would be cheaper to place the mine entrance on a separate one-acre parcel of the superjacent land that he had not purchased outright, which was over 400 feet from the five-acre parcel the buyer had previously purchased. The mineral rights owner failed in his attempt to purchase outright this

additional acre of land, but, against the protestations of the surface owner, took possession of it, cut its timber, sunk a mine shaft and prepared to commence full mining operations. The *Friedline* court found:

"Where a vendor of the surface reserves the coal, with no stipulation as to the mining thereof, he will be entitled to such use of the surface as is necessary to make his reservation effective; but, if he owns adjoining property, through or over which it is practically possibly to mine and remove the reserved coal, he will not be entitled to use for that purpose the conveyed surface. A way of access to property, granted or reserved, will be implied only when necessary to give effect to the grant or reservation but never merely as a matter of convenience. Here, when defendants bought the coal, they owned five acres of plaintiff's surface, which the chancellor finds was a means of access to the coal; he also finds, in effect, that while it is not the most convenient avenue of approach to the coal the latter can thereby be mined at a profit and that it is commercially feasible to do so. . . .

"Where the parties agree as to the method of access to the coal, the law will not imply a different way, although more convenient. Here, however, independently of such an agreement, defendants have a practicable way over their owns lands for the removal of the coal in question; hence, the law cannot allow them a right-of-way by necessity over plaintiff's land."

*Friedline v. Hoffman*, 271 Pa. at 534–35, 115 A. at 846 (citations omitted).

This Court has also recognized the need for surface owners to have the right to enjoy their land, free from unreasonable interference stemming from mining operations; this includes the doctrine of subjacent support. *Kearney*, 114 Md. at 500–03, 79 A. at 1015–16. Petitioner contends that the Court of Special Appeals failed to apply *Kearney* to the case at bar and that the lower court's holding was in "direct conflict" with *Kearney*. In essence, petitioner argues that *Kearney* stands for the proposition that the owner of the mineral rights

cannot, under any circumstance, enter the surface of the property. We disagree that such a proposition, standing alone, supports the position of petitioner.

Petitioner references language in *Kearney* which, according to petitioner, directs that "the owner of the surface has the right of subjacent support for the surface and the owner of the minerals is entitled to remove only so much of them as he can take without injury to the surface, unless otherwise authorized by contract or statute." In fact, the actual language in *Kearney* stated:

> "The general rule of law is that when the estate in minerals 'in place,' as they are sometimes spoken of in their natural bed, is severed from the estate in the surface, the owner of the latter has an undoubted right of subjacent support for the surface, and the owner of the estate in the minerals is entitled to remove only so much of them as he can take without injury to the surface, unless otherwise authorized by contract or statute."

*Id.* at 501, 79 A. at 1015. *But cf. George's Creek Coal & Land Co.*, 250 Md. 125, 242 A.2d 165 (holding, that when a deed is ambiguous as to whether grantor's reservation included strip mining, extrinsic evidence was to be used in ascertaining intent of the parties, thus, even though strip mining would severely injure the surface, it was allowed because of the parties' intent). While the language of *Kearney* appears, as petitioner contends, to require no injury to the surface, it is taken out of context. The reservation in *Kearney* was comprehensive, including an easement clause, and reserved the mineral rights along with "the right to mine and remove the said coal or minerals at such place or places as may appear to them, the said first parties, their heirs or assigns, most suitable and convenient." *Id.* at 500, 79 A. at 1015. As such, the parties in *Kearney,* in the deed, expressly decided all issues relating to the mineral rights owner's access to the minerals. The parties decided that the mineral rights came with a right to "mine and remove" the coal from a place deemed "suitable and convenient" solely by the mineral rights owner.

Our holding, in *Kearney* merely dealt with issues of supporting the surface *after* the mineral rights owner had properly entered beneath the surface and commenced removing the minerals. There was no issue in *Kearney* relating to surface access to the minerals. The rule of law arising in that case was that, in Maryland, a mineral rights owner has a duty to support the surface during mining activities, *i.e.*, ensuring that the superjacent surface does not collapse. *Kearney* remains good law, but does not speak to whether, when the deed is silent as to the issue, an implied reservation to use the superjacent surface for access exists. The Court of Special Appeals was correct in not relying on *Kearney* as determinative in the issues in the case *sub judice*.

### 3. Respondents' Use of Surface Lands

Given our holding that mineral rights owners may, under proper circumstances, have an implied easement to use the superjacent surface and that the language of the deed in the case *sub judice* is silent in reference to the scope of the mining rights access reserved by respondents, we now apply the facts of this case to our doctrine of implied easements to ascertain whether the parties intended for respondents to reserve an easement over and/or through the surface of the Calvert Property.

When a grantor conveys surface rights knowing that the purpose of the grantee is to utilize the surface for a particular purpose such as a residential home subdivision,[27] there is no inference that can be reasonably drawn, merely from the reservation of mineral rights, that the grantor reserves the right to an easement to disturb the surface to access the minerals in a way that would disturb the intended surface use so as to make that use impracticable. The retention of such an unfettered and general implied easement would

---

27. It is not unreasonable to assume that respondents knew or should have known that the petitioner, a joint venture formed to develop and market land, intended to maximize the lot yield of the subject property, rather than subdivide it for only a few lots.

impermissibly conflict with the uses for which the grantor conveyed the property. It, in essence, would, if not destroy, certainly severely affect, the marketability of the residential lots, and the subsequent use of such lots for all of the purposes we have noted. The conflict is avoidable when the grantor, at the time of the conveyance, retains adjacent, or other property, from which access to the minerals might be made.

In this case, it is clear that surface access from the Calvert Property to the subsurface minerals at issue here was not intended at the time of the land installment contract or at the time of conveyance. Such surface access, in these circumstances, would be clearly incompatible with the surface use as a residential subdivision. Additionally, there is no evidence that, at the time of the conveyance, such access was even necessary.[28] As we indicated earlier in this opinion, at trial petitioner's witness claimed, on cross-examination, that it was "not inconceivable" that the minerals could be accessed from respondent's adjoining property. No contrary evidence was proffered by respondents.[29] Accordingly, no implication that surface access is necessary can be made and thus no implied easement exists.

---

**28.** In the opening statement at trial, respondents' counsel stated:

"I believe the [petitioners] are going to offer testimony, for instance, as to whether it is feasible for [respondents] to get to the minerals, whether it is possible under the current law today for them, for instance, to put an oil well on this property. I don't think that is before the Court or there is going to be an expert testimony as to what is feasible and what is not feasible.

"I would just say to the Court that even if it were true under today's law it would be difficult for my clients to exercise their rights. My clients are not here to say we are going to sink this well today."

**29.** This point underscores an alternative basis for holding that no implied reservation arose on the record of this case. Respondents, as the proponents of the existence of an implied reservation of surface access in this declaratory action, had the burden to adduce competent evidence establishing each of the elements needed to give rise to the existence of such an implied reservation. This they failed to do. In fact, they not only failed to discharge their duty to put forth affirmative evidence in this regard, they resisted petitioner's efforts to adduce evidence tending to prove that no such reservation should be recognized.

■ We think that an analysis of our doctrine of implied easements illustrates that reasonableness of the intrusion on the property to access the mineral rights is not the only factor involved; necessity of that right is also an element. It must be reasonable and necessary. In this case, based on the evidence actually presented, it was neither. Many of the cases cited herein have involved deeds with specific reservations granting the surface access rights respondents claim are implied by a reservation of mineral rights in the deed in the case at bar. If respondents meant to reserve access to the surface of land they knew was being purchased for a residential subdivision, they should have expressly included such a conflicting right within the contract and deed. As no such clause appeared in the deed and, further, at the time of conveyance respondents retained ownership of an adjacent parcel from which access might be possible, we hold that respondents cannot access the surface of this proposed residential subdivision for mining purposes.

## B. Duration of the Mineral Rights Reservation

■ Petitioner's final question to which we granted *certiorari* deals with the duration of the mineral rights interests created by respondents' express reservation in the special warranty deed. Petitioner claims, despite the clear language in Section 4–105 of the Real Property Article of the Maryland Code stating that words of inheritance are not necessary to create a fee simple estate, that respondents' reservation is limited to a life estate in the mineral rights because no words of inheritance are used. This contention has no merit.[30]

The Maryland Legislature codified the principle that words of inheritance are not necessary to create a perpetual estate when it enacted § 4–105 of the Real Property Article, which states:

─────────

**30.** The parties have agreed that separate estates in property have been created, but only differ on the character of the estates. We shall address the issues as argued by the parties. However, there remains the question of whether an estate in the subsurface, as opposed to a right to extract minerals, is created by the language used here.

"No words of inheritance are necessary to create an estate in fee simple or an easement by grant or by reservation. Unless a contrary intention appears by express terms or is necessarily implied, every grant of land passes a fee simple estate, and every grant or reservation of an easement passes or reserves an easement in perpetuity."

Md.Code (1974, 1996 Repl. Vol) § 4–105 of the Real Property Article. This principle pre-dates the case of *Hawkins v. Chapman*, 36 Md. 83, 94 (1872), when this Court said:

"The text writers and reports establish beyond doubt that words of limitation or inheritance are not essential to create an estate in fee; nor is the nature of the estate conveyed, whether a trust or use executed, determined so much by the terms used, as the object to be effected. In *Hill on Trustees*, 455, it is said, 'A trustee will take the fee without the word "heirs," when necessary for the trust.' The same principle is announced in *Spessard, et al., v. Rohrer, et al.*, 9 Gill 261, where the deed conveyed lands without the word 'heirs' to a trustee, with power to sell to pay debts."

*See also Farquharson v. Eichelberger*, 15 Md. 63 (1860). This Court rearticulated this principle in the case of *Case v. Marshall*, 159 Md. 588, 594, 152 A. 261, 264 (1930), when we said:

"With the statutes now in force in this state, it is, we think, well settled that, where a contrary intention is not clearly shown, both deeds and assignments, as well as wills, though without words of limitation or perpetuity, are presumed to carry such estate as the grantor, assignor, or testator has the power to convey, assign, or dispose of by will, and not an estate limited to the life of the grantee, assignee, devisee, or legatee, or an estate or interest less than that over which such party has the power of disposition."

Additionally, as to reserved easements, we reiterated the principle in *Greenwalt v. McCardell* 178 Md. 132, 136, 12 A.2d 522, 524 (1940), where we stated:

"It is well established that whenever it appears from a fair construction of a deed that it was the purpose of the

> parties to create or reserve an easement in the property conveyed for the benefit of other land owned by the grantor, regardless of the form in which the purpose may have been expressed, such a right is deemed to be appurtenant to the land of the grantor and binding on that conveyed to the grantee; and the right thus created or reserved will pass to all subsequent owners of the land to which it is appurtenant."

As the evolution of this long standing principle culminating in the creation of § 4–105 suggests, there is no question that Maryland law has long favored estates in fee simple even in the absence of words of inheritance.

Given the unambiguous language of § 4–105, the only way in which petitioner could possibly prevail given the positions argued by the parties would be if respondents' reservation "necessarily implied" that only an interest for life was reserved. Although in its argument petitioner points to several factors in the deed's, and land installment contract's, language that, petitioner argues, necessarily implies a conveyance of a life estate, not one of those factors, either reviewed in conjunction or isolation, rise to the level required to support the desired implication sought by petitioner. We do not believe, as petitioner does, that the omission of words of inheritance in a reservation of the right to execute leases or other documents relating to mineral rights, which "specifically and unequivocally identified" only the names of respondents, necessarily implies that the duration of the interests was for only the lives of those named people. Nor do we believe that language stating "that any dispute regarding the terms and conditions is to be resolved by the contract as written and not by any *prior* documented agreements or understandings," implies the same. In fact, respondents counter by arguing that the lease language signifies that the right to decision-making with respect to the minerals is reserved, along with the actual mineral rights, to the respondents and their heirs and that it instructs that the owner of the surface, *i.e.*, petitioner, has no voice in any issues arising from the leasing of respondents' mineral rights. Similarly, the dispute-resolving language merely illus-

trates an intention by the parties to resolve any disputes with respect to their intent at the time the document was conveyed. The very existence of these reasonable alternative meanings to petitioner's contention that the deed's language purportedly limits the interests reserved by respondents to a life estate, dispels any notion that petitioner's interpretation is "necessarily implied."

Additionally, language in the deed of October 1996 that specifically grants the property "to the Grantee . . . its successors and assigns, in fee simple" without using parallel language for the reservation clause, is not enough to overcome the substantial burden imposed on petitioner by § 4–105. Given Maryland's long history of favoring the creation of estates in fee simple and the fact that the deed contains no express terms expressing a limitation of the duration of the "estate," we affirm the lower court on this issue.

There is also another reason why a strong inference exists, in the absence of any evidence to the contrary, that the parties intended no time limitations on the character of the minerals rights' interest created by the conveyance at issue. A life estate in mineral rights would be, basically, commercially unmarketable. Life estates, of necessity reference a life *in esse*. When that life ceases, the right to mine minerals from the total estate would also cease. In other words, in the present case if the respondents had died the day after the subject conveyance, their minerals rights' interest would have ceased. This very pertinent fact is well known to investors, purchasers, lenders and anyone conversant with aspects of titles. No bank would lend money to respondents to mount a mining venture using the mineral rights as collateral, by mortgage or otherwise, because the mineral rights would have a limited life, and could have a very limited life—days, minutes even. Upon the death of the holders of the life "estate," paramount title in the minerals, in the circumstances of a grant with a reservation of a life estate in the minerals, would pass to the owners of the whole estate—in the present case, petitioner. In other words, the collateral would vanish. Likewise, no reasonable buyer would purchase the right to mine

minerals when the right would be extinguished if the holders of the life estate were killed in an automobile accident on the way home from signing the documents that granted the mineral rights.[31]

In order to convey the mineral rights they have reserved, if they had only reserved a life interest, respondents in this case would have to obtain the agreement of the owner of the total "subject to" estate, petitioner, and have it sign over its rights as remainderman (or remainder persons) in the minerals in order to market the mineral rights, by lease or otherwise. The Land Installment Contract and the subsequent deed included the reservation to respondents of the right to "execute leases and other documents relating to the production of oil, gas, and other minerals upon such terms and conditions as are acceptable to sellers [respondents]." (alteration added). The language of the documents themselves are inconsistent with the language that would, under the circumstances here present, need to be used in order to create a "life interest." Generally, inferences would not suffice to create such a se-

---

**31.** In rare instances, generally involving family matters one would suppose, life estates in mineral rights might be created; for instance a conveyance of a life estate to a family member where the grantor retains the fee, and the family member is sufficiently affluent to finance the mining out of his pocket. If the life holder dies, the mineral rights would revert to the granting family member, *i.e.*, stay in the family. There may be a rare investor that would be willing to gamble on the life span of the life interests' holder, but it would not appear that such gamblers are to be found with sufficient frequency to make such interests commercially marketable.

In fact, one could imagine the following scenario when such a "gambler" on life purchases mineral rights whose duration is limited to the life of another. After the purchase, the gambler would become a de facto guardian angel of the life interests' holder, while the remainderman would have no interest in preserving that same life. For instance, if the life interests' holder suffered an injury causing him to be in a coma or on life support, the gambler would do everything in his power to prolong *the life interests' holder's* life, while the remainderman would advocate "pulling the plug," which, inevitably, would spawn litigation.

In any event, when speaking of marketability, we are not concerned with family arrangements, or gamblers on lives, but we are addressing commercial marketability, unfettered alienability of interests in land.

verely limited interest.[32] To create a "life interest" limitation that would so severely affect the marketability of that interest, the language (whether exception, grant or reservation) in the creating document must explicitly so provide. The mineral rights reservation in the case *sub judice* is not so limited.

### III. Conclusion

We hold that, under the circumstances of this case, respondents are precluded from using the surface of the Calvert Property under the reservation clause in the October 1996 special warranty deed. Had respondents desired to retain the right to prospect for and/or mine minerals from the surface of the subject property in spite of its intended use for a residential subdivision, they could have, at the time of the conveyance, easily expressly reserved an easement to utilize the surface land. They did not do so. Although an owner of mineral rights under a property may, under appropriate circumstances, be entitled to an implied reservation of an easement to access those minerals from the surface even where the deed's language makes no mention of such a right, that use must be both reasonable *and* necessary at the time of the conveyance in which the minerals are excepted, reserved or granted. We hold that, under the special circumstances here present, any access to the surface of the residential subdivision for mining would be unreasonable and in conflict with the intended purpose of using the property as a residential subdivision. This is especially true where, as in this case, respondents were well aware of the fact that petitioner planned to use the property for residential subdivision purposes. Under these circumstances, we hold that respondents failed to meet their burden of proof as to the elements required to establish the implied reservation at issue.

While we couch our conclusion in terms of the specific intended use of the surface in this case, *i.e.,* a residential subdivision, our holding extends to any surface use where,

---

**32.** There is not even an inference that can be made under the circumstances here present.

under the circumstances of a particular case, utilization of the surface to prospect for, or to extract, subsurface minerals, would unreasonably interfere with the known intended uses of the surface.

In addition, an implied easement to use the surface of the property was unnecessary under these facts as, at the time of the conveyance, respondents in this case owned a tract of land adjacent to the subject property.[33] Thus, we reverse the Court of Special Appeals as to this issue. Respondents have no right to use the surface of the Calvert Property in the exercise of their mineral rights.

We further hold that, although the doctrine of subjacent support is still valid in this State, it is not presented as an appropriate issue in the case *sub judice*. Finally, pursuant to well-established law, we affirm the Court of Special Appeals in that respondents' reservation of all oil, gas and other mineral rights in this case was a reservation of a perpetual interest, pursuant to § 4–105 of the Real Property Article of the Maryland Code.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR THE ENTRY OF JUDGMENTS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE DIVIDED EVENLY BETWEEN PETITIONERS AND RESPONDENTS.**

---

**33.** Claims of implied easements, if any, are ordinarily examined based on the circumstances in existence at the time of the conveyance at issue.